**Edwin C. ANDERSON and Betty D. Anderson, as heirs at law of David S. Anderson, Plaintiffs,**

v.

**GUS MAYER BOSTON STORE OF DE-LAWARE, aka Gus Mayer Boston Store, aka Boston Dry Goods Company dba Boston Store of Texas, Inc., Defendant.**

No. 1:94–CV–0232.

United States District Court, E.D. Texas, Beaumont Division.

March 23, 1996.

Shimon Kaplan, East Texas Legal Services, Beaumont, TX, for David Scott Anderson, Edwin C. Anderson, Betty D. Anderson.

Daniel V. Flatten, Mehaffy & Weber, Beaumont, TX, for Gus Mayer Boston Store of Delaware.

## MEMORANDUM

COBB, District Judge.

Today the court considers cross-motions for summary judgment. The operative issue in this case is whether the defendant, Gus Mayer Boston Store of Delaware (Gus Mayer), violated the Americans with Disabilities Act of 1990[1] (ADA) by discriminating in the privileges, conditions, or terms of employment against David Anderson. Although the disputed facts of this case are not extensive, the controlling area of law is new and not yet definitive.

The ADA requires covered entities[2] to provide workers with disabilities with equal access to group health insurance plans, if any such plans exist. The ADA seems to make denying a disabled individual insurance of any kind because of that disability (or any proxy associated therewith) a violation of the Act.

After extensive research into the relevant agency interpretations, legislative history, scholarly debate, and case law, this court finds there to be only one genuine issue of material fact in this case. If it were not for the fact question raised by the defense of undue hardship, the plaintiffs would be entitled to judgment as a matter of law against

---

1. 42 U.S.C. §§ 12101–12213.

2. Generally, a covered entity will be an employer.

Gus Mayer for violations of the Americans with Disabilities Act. Both the Defendant's Motion for Summary Judgment and the Plaintiffs' Motion for Partial Summary Judgment are DENIED. Trial on the issue of undue hardship will be required to determine liability, and the trial will be held in accordance with the holdings stated below.

### CAVEAT

The case *sub judice* conjures up difficult issues of statutory construction. In the interests of justice and the development of the law, this Court in good faith has made the holdings demanded of it under the pleadings and summary judgment proof presented by the parties. The combined weight of judicial guidance in any number of essential matters to this case could rest upon a single reed; hence, the holdings which follow attempt to be as complete an understanding of the ADA's relevant provisions as this Court could muster from the appropriate authorities.

■ The issue in this case is simply stated: Does an employer acquit all its ADA duties when it selects a group insurer that has refusal standards [3] which effectively deny an employee an equal opportunity to obtain coverage due to the employee's disability-status? [4] This Court finds that when a group insurer makes it a policy to refuse to extend coverage to an employee with a disability because of that disability, an employer violates the ADA by selecting that group insurer unless he makes provisions for the excluded individual to receive comparable health insurance in some other way. As with other provisions of the ADA, however, an employer may avail itself of the undue hardship defense upon appropriate proof.

### BACKGROUND

Gus Mayer, a sole proprietorship owned by Randolph Ney, is a retail store in Beaumont specializing in ladies' fashion wear. David Anderson spent his entire adult working career, starting in 1982, in the employ of Gus Mayer until shortly before his death. After Anderson's death from AIDS, his parents were substituted as plaintiffs in their capacity as his heirs at law.

Gus Mayer in the past had provided its employees with the opportunity to subscribe to a group health policy. Home Life Insurance Company (Home Life) began writing the group's coverage in 1989. As part of the employees' compensation, Gus Mayer paid fifty percent of the premiums charged the group with the participating employees paying the other fifty percent. Home Life adjusted premiums twice each year.

Anderson was diagnosed with testicular cancer in 1988. He had surgery and radiation treatment at that time. Home Life documents illustrate that it is Anderson's cancer which was one source of increased premiums.

Anderson was diagnosed with Human Immunodeficiency Virus (HIV) in July 1991. Fearful that he might lose his health insurance coverage simply because he was HIV-positive, Anderson began seeing a private doctor for his condition, paying out of his own pocket. At this time he also was diagnosed with having Acquired Immunodeficiency Syndrome (AIDS). In August, 1991, this private doctor sent by mistake one bill to Home Life, the Gus Mayer group underwriter. As of that date, Home Life was on notice of Anderson's condition.

In September 1992, Home Life announced a further premium increase of thirty percent. Ney knew around this time of Anderson's HIV-condition. Even keeping in mind that health insurance costs throughout America were increasing as a matter of course, records from Home Life show that much of the increase in the group insurance was due in 1990 to Anderson's cancer and was due in 1991 to Anderson's cancer and AIDS-status.

Some of the group members informed Randolph Ney that if reduced premiums

---

3. In the insurance industry, a refusal standard is also known as a declination standard.

4. More narrowly stated: Can an employer contract with an insurer to provide health insurance to all its employees who do not have AIDS (a covered disability), if the insurer can cite valid alternative reasons (unrelated to the disability) for its decision to totally deny the disabled employees (those with AIDS) with insurance coverage of any kind?

were not secured they would withdraw from the group. The number of employees participating in the group plan at that time had decreased to about twenty.

Ney told his agent Ross Green to seek other coverage with new carriers. Ney was informed that a new carrier, John Alden Life Insurance Company ("JALIC"), had been found and that it had the flexibility to deny some members of the group. In what later seems to have been a *pro forma* exercise, Ney told his participating employees to fill out application forms for the new insurance. Ney assured the employees that JALIC was the insurer for the group and that there would somehow magically be reduced premiums and more coverage.[5]

Fearful that he would be denied access to the group insurance due to his AIDS-status, Anderson spoke to Ney regarding his concern about the prospective change of coverage. Ney and Green were at a loss for comforting words to the understandably distraught Anderson. After a period of awkward silence, Ney told his long-time employee to wait and see if JALIC allowed him into the group before worrying.

Predictably,[6] JALIC ended up rejecting Anderson. JALIC's putative reason[7] for denying Anderson coverage was that he had been treated within the last ten years for cancer. Even after JALIC's decision to deny coverage only in Anderson's case, Gus Mayer decided to go ahead and switch group policies[8] effective January 1, 1993. Gus Mayer

made no timely effort to secure any alternative policies for Anderson either before or after this incident.

Now faced with the terrible realization that his employer would no longer help secure health insurance of any kind for him, Anderson timely filed a complaint with the Equal Employment Opportunity Commission in Houston. Soon thereafter, Anderson left his position with Gus Mayer. On May 4, 1993, the EEOC found that Gus Mayer had committed two violations of the ADA: first, when Gus Mayer denied Anderson access to any group health insurance; second, when Gus Mayer entered into a contract which resulted in the discrimination against Anderson.

After the EEOC issued Interim Guidelines on how the ADA should be applied in the health insurance context,[9] counsel for Gus Mayer urged an official reconsideration of the agency's Determination. The EEOC agreed to reconsider the matter. On July 1, 1993, the EEOC District Director, Harriet Joan Erlich, replied in letter form. Ms. Erlich stated that the Interim Guidelines applied to situations where disability-based distinctions in coverage had been drawn. Gus Mayer's actions, however, led to a complete denial of health benefits. Here there were no distinctions in coverage terms; rather some people received coverage while Anderson received no coverage of any sort.

---

**5.** See page 84 of Plaintiffs' Partial Summary Judgment Addendum.

**6.** *Viz.*, predictable given the suspicious circumstances: e.g. the uncanny premonition of Green and Ney that the group would see drastic reductions in premiums and deductibles with increased coverage. Also the fact that Ross knew that JALIC was not rating the entire group but rather was looking at each individual to determine whether it would accept an individual and at what rate.

**7.** JALIC representative Kathy Reyes' deposition testimony seems incredible. She claims that Anderson was denied inclusion in the group because of his cancer. The fact that he had HIV never crossed her mind, even though to her knowledge JALIC had never accepted an HIV-positive applicant. Indeed, JALIC had an automatic refusal directive for AIDS applicants. Fur-

thermore, she admitted that JALIC sometimes looked at cancer on a case-by-case basis, although in almost the same breath she said cancer was an automatic declination standard.

Finally, adduced in Ney's testimony was the fact that one of the members of Gus Mayer who was covered by JALIC had cancer and another had a tumor which was possibly cancerous. For some mysterious reason these two individuals were not automatically refused coverage by JALIC.

**8.** Gus Mayer was under no obligation whatsoever to choose JALIC as its group insurer even after rates were quoted subsequent to the application processing.

**9.** The EEOC Interim Enforcement Guidelines ("Interim Guidelines") were released on June 8, 1993.

This determination by the EEOC is a quintessential example of an agency interpreting its own guidelines (such interpretations are to be afforded great deference). Pursuant to 28 U.S.C. section 1331, Anderson initiated suit in this Court against Gus Mayer.

■ The Americans with Disabilities Act broadens employment opportunities for millions of disabled workers. This landmark legislation bars discrimination against the disabled in all aspects of employment, public services, public accommodations, and telecommunications.[10]

■ The ADA was the culmination of the disability rights movements efforts to effectuate civil rights protection for Americans with Disabilities.[11] It is important to keep in mind that lawmakers made clear that the ADA was *norm-changing legislation,* akin to the legislative turning points in this country's struggle to overcome racial discrimination. President Bush referred to the Act as a **"historic new civil rights Act."**[12] Senator Tom Harkin, the champion of the Act, announced it to be the **"20th century Emancipation Proclamation** for all persons with disabilities,"[13] while Senator Dole called it **"the most comprehensive civil rights legislation** our Nation has ever seen."[14] Unlike other legislation designed to settle narrow issues of law, the ADA has a comprehensive reach and should be interpreted with this goal in mind.

## ANALYSIS

### I. ANALYTICAL FRAMEWORK.

■ Because the Court has not found any case which promulgates an analytical approach to the issues in this case, an outline of the questions resolved in reaching today's decision is provided. The threshold analysis undertaken in determining whether Gus Mayer violated the Americans with Disabilities Act takes into account the following steps:

1. It is illegal for a covered entity;

2. or a third party in privity with a covered entity;

3. to discriminate along terms of employment;

4. including fringe benefits;

5. access to group insurance being such a fringe benefit;

6. against an otherwise qualified individual with a disability.

The more difficult stages in the analysis requires this court examine:

7. whether the employee had a disability; and

8. whether an employer's change of insurers (for the purpose of reducing premiums), fully aware of the consequences to the disabled individual, to another insurer with flexibility to deny coverage completely to that disabled individual is discrimination.

Finally, the court must consider whether any defenses to discrimination apply such as:

9. the insurance exception (section 501(c)); or

10. the undue hardship/changed circumstances defense.

### II. APPLICATION OF THE ANALYTICAL FRAMEWORK.

#### A. EEOC Regulations & Guidelines are Usually Controlling.

■ In the context of the ADA's application in the area of health insurance, this Court has examined the regulations as well

---

10. Titles I through IV of the Act respectively.

11. Previous legislation included the Rehabilitation Act of 1973, the Education for All Handicapped Children Act, the Voting Accessibility for the Elderly and Handicapped Act, the Air Carrier Access Act, and the Fair Housing Amendments Act.

12. Robert L. Burgdorf, Jr., *The Americans with Disabilities Act: Analysis and Implications of a*

*Second–Generation Civil Rights Statute,* 26 Harv. C.R.–C.L.L.Rev. 413 (1991) (quoting President Bush at the signing ceremony).

13. 136 Cong.Rec. S9688 (daily ed. July 13, 1990) (emphasis added).

14. 136 Cong.Rec. S9695 (daily ed. July 13, 1990) (emphasis added).

as the Guidelines interpreting those regulations. These pronouncements by the EEOC are immensely probative to the issues of this case. Ever since the Supreme Court's decision in *Chevron v. Natural Resources Defense Council, Inc.,*[15] courts have recognized that the agency responsible for administering a regulatory scheme is often in the best position to interpret that scheme. Economies of scale, collective expertise, and other factors weigh in favor of deferring to the agencies who are most familiar with specialized issues of regulation.

Furthermore, the interpretative process often requires policy making. The courts are not chartered to engage in policy making, and a choice between competing interpretations often is predicated upon policy considerations. Such policy choices are politically more legitimate if made by an accountable government actor responsible for the regulatory scheme.

The *Chevron* Court recognized that both courts and agencies are bound by Congress's directives. The first question addressed in any interpretation of a statutory scheme, then, is whether Congress has explicitly addressed the issue in question.

■ The Americans with Disabilities Act clearly allows[16] the EEOC to promulgate regulations to fill many gaps in the statutory scheme. In this situation, the EEOC's interpretations (i.e. regulations) are given "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron* at 843–44, 104 S.Ct. at 2782.

■ Going one step further, the EEOC Enforcement **Guidelines** issued by the EEOC interpreting its own regulations are given an even higher, if not the highest, standard of deference. "When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order." *Udall v. Tallman,*

380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). Therefore, when an agency pronounces what its own regulations mean, that pronouncement is understood to be prima facie correct. What court would presume to tell an agency that when it promulgated regulation X it did not really *mean* to do so?

■ Not only do courts need to give deference to agency regulations and heightened deference to agency interpretations of those regulations, but there is an additional reason why the EEOC interpretation of the ADA is to be respected. When, as is the case with the ADA, an agency is entrusted with implementing an entirely new statutory scheme, judicial deference is especially appropriate.

■ The content of these agency interpretations of the statute and regulations applying the ADA to group health insurance situations will be discussed in Part E of this memorandum. This Court finds that these regulations "represent[ ] a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute." *United States v. Shimer,* 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961). Likewise, the Guidelines promulgated by the EEOC are well-reasoned interpretations of the regulations.

### B. Preliminary Determinations.

1. GUS MAYER IS A COVERED ENTITY.

A covered entity includes employers, employment agencies, labor organizations, and joint labor-management committees. 42 U.S.C. § 12111(2). Gus Mayer is an employer with the requisite number of full time employees; as such, Gus Mayer is a covered entity under the ADA.

2. JALIC's ACTIONS ARE IMPUTED TO GUS MAYER.

■ The ADA forbids employers from contracting with others to provide fringe

---

**15.** 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (requiring that an agency interpretation only be *reasonable* to be afforded deference if Congress's intent is unclear).

**16.** Even if one were to find that the ADA simply *implies* that the EEOC can render interpreta-

tions, the Supreme Court has indicated that a court is not free to "substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 842–44, 104 S.Ct. at 2781–82.

benefits, if the third-party providers themselves engage in discrimination based upon disability status. Hence, discrimination in the provision of fringe benefits based upon disability status is illegal whether the benefits are provided by the employer directly or contracted out. 42 U.S.C. § 12112(b)(2); 29 C.F.R. § 1630.6(a).

3. DISCRIMINATION ALONG TERMS OF EMPLOYMENT IS ILLEGAL.

 Discrimination is to adversely affect the opportunities or status of an individual with a disability because of that disability. 42 U.S.C. §§ 12112, 12182. One can also violate the ADA by omission. That is, it can also be illegal for an employer to refrain from taking steps or making modifications that may be necessary to ensure that disabled individuals do not suffer discrimination. 42 U.S.C. § 12182(b)(2)(A).

4. TERMS OF EMPLOYMENT INCLUDE FRINGE BENEFITS.

 Terms of employment include opportunities and status. 42 U.S.C. § 12112(b)(1). Fringe benefits are opportunities and as such cannot be denied individuals simply because they have disabilities.

5. ACCESS/COPAYMENT TO GROUP HEALTH INSURANCE IS A FRINGE BENEFIT.

The Committee Reports accompanying the passage of the ADA specifically name insurance as a covered employment benefit.[17]

6. MR. ANDERSON WAS OTHERWISE QUALIFIED.

A qualified individual is defined by the ADA to be a person with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position. 42 U.S.C. § 12111(8).

There is no dispute that Anderson was entirely able to continue in his position as a merchandise buyer.

C. What is a Disability?

 The ADA defines "disability" to mean:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). Thus, there are three types of situations covered by the ADA's disability language: first, when an individual has a present disability; second, when an individual has a record of past disability; and third, when an individual is perceived to have a disability.

The Fifth Circuit has found this definition of **disability** to be "substantially equivalent to that in the Rehabilitation Act." *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 725 n. 4 (5th Cir.1995); *Chandler v. City of Dallas*, 2 F.3d 1385, 1391 (5th Cir.1993) ("The ADA defines a disability in substantially the same terms as the [Rehabilitation] Act defines an individual with handicaps."), *cert. denied*, ─── U.S. ───, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994). Other authorities [18] have also noted the ADA's intent to adopt the Rehabilitation Act as a guide.

 An impairment alone is not a disability under the ADA. Rather, the impairment must be one which substantially limits one or more major life activities. In other words, one can easily perceive the concept that the term disability contains two necessary components. To be a disability, a condition must both impact upon on a major life

**17.** *The Legislative History of Public Law No. 101–336*, The Americans with Disabilities Act. Serial No. 102–A, 102–B, and 102–C, Y4.Ed 8/1: 102–A, B, C. at 127, 182, 332, 409, 511; DOJ Regs., 28 C.F.R. at § 36.212 (1992). Employee benefit plans constitute "other terms, conditions and privileges of employment." 42 U.S.C. § 12112(b)(4).

**18.** 29 C.F.R. Pt. 1630, Appendix to Part 1630—. Interpretive Guidance to Title I of the ADA, § 1630.2(g) ("Congress intended that the relevant case law developed under the Rehabilitation Act be generally applicable to the term 'disability' as used in the ADA."); *Collings v. Longview Fibre Co.*, 63 F.3d 828 (9th Cir.1995), *cert. denied*, ─── U.S. ───, 116 S.Ct. 711, 133 L.Ed.2d 666 (1996); *Bolton v. Scrivner, Inc.*, 36 F.3d 939 (10th Cir.1994), *cert. denied*, ─── U.S. ───, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995).

activity and such impact must be a substantial impairment.[19]

 The regulations promulgated by the EEOC pursuant to the ADA "provide significant guidance"[20] as to the meaning of **major life activities.** *Dutcher,* at 726. These EEOC regulations adopt the same definition as given in the Rehabilitation Act.[21] *Bolton v. Scrivner.* "Major life activities" include functions such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).[22] This listing is illustrative and not intended to be exhaustive. *Dutcher* at 726 n. 7. Impair-

ments on the procreative process also substantially limit a major life activity.

The EEOC regulations make explicit some factors to be considered when attempting to see if a condition **substantially limits** a given activity. These enumerated factors are: (i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.[23]

 Conditions such as AIDS[24], HIV[25], blindness, and deafness, *inter alia,* have been

**19.** "Disability" =
1. an impact upon a major life activity and
2. such impact must be a substantial impairment.

**20.** The ADA contains no definition of "major life activities." Hence, the EEOC regulations issued to implement Title I of the ADA are greatly relied upon.

**21.** 29 U.S.C. §§ 701–797 (1988, Supp. III 1991 & Supp. V 1993).

**22.** The ADA itself does not define major life activities, so the court is guided by EEOC regulations and case law. *See Bolton v. Scrivner, Inc.,* 36 F.3d 939, 942 (10th Cir.1994).

**23.** 29 C.F.R. 1630.2(j)(2).

**24.** Because of the substantial limitations placed upon a person with AIDS (ability to procreate and engage in intimate sexual relationships) major life activities are hampered. Tracy S. Guice, 18 Law & Psychol.Rev. 377 (Spring 1994) "AIDS Discrimination in Employee Health Benefits". *See* 29 C.F.R. § 1630.2(j) (1993); House Comm. on Educ. & Labor, *Americans With Disabilities Act of 1990,* H.R. Rep. No. 485(II), 101st Cong., 2d Sess. 52 (1990) 1990 U.S.C.C.A.N. 267, 303; S.Rep. No. 116, 101st Cong., 1st Sess. 7, 22, 24 (1989).

*See also Robertson v. Granite City Comm. Unit School District,* 684 F.Supp. 1002, 1006–07 (S.D.Ill.1988) (student with AIDS complex found to be handicapped under the Rehabilitation Act); *Doe v. Attorney General of the United States,* 941 F.2d 780, 797 (9th Cir.1991) (finding that people with AIDS are handicapped), *cert. denied,* 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1991); *Chalk v. United States Dist. Court Central Dist. of California,* 840 F.2d 701, 704–05 (9th Cir.1988) (same); *Doe v. Garrett,* 903 F.2d 1455, 1459 (11th Cir.1990) *cert. denied,* 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1991) (noting it to be well established that "infection with AIDS" constitutes handicap under the Rehabilitation

Act); *Martinez v. Hillsborough County School Board,* 861 F.2d 1502, 1506 (11th Cir.1988) (assuming AIDS under the Rehabilitation Act is a handicap). *Cf. Hilton v. Southwestern Bell Telephone Company,* 936 F.2d 823 (5th Cir.1991) (finding AIDS as not a handicap within meaning of section of Texas Commission on Human Rights Act), *cert. denied,* 502 U.S. 1048, 112 S.Ct. 913, 116 L.Ed.2d 813 (1992).

**25.** The Senate and House Labor Committees as well as the EEOC recognized that HIV infection is a disability. *See, e.g.,* H.R.Rep. No. 485, 101st Cong., 2d Sess., pt. 3 at 18 n. 18 (1990) ("Persons infected with the Human Immunodeficiency Virus are considered to have an impairment that substantially limits a major life activity") 1990 U.S.C.C.A.N. 267, 445–451; H.R.Rep. No. 485, 101st Cong., 2d Sess., pt. 2 (1990) (including HIV among the list of ADA covered conditions) 1990 U.S.C.C.A.N. 267, 303.

In an opinion letter, the EEOC has determined that HIV-status is a disability when medical benefits are involved. Tracy S. Guice, 18 Law & Psychol.Rev. 377 (Spring 1994) "AIDS Discrimination in Employee Health Benefits" (discussing *Terrence Donaghey v. Mason Tenders District Council Trust Fund*). *See D.B. v. Bloom, Madison Dental Centre,* 896 F.Supp. 166, 170 (D.N.J. 1995) (stating an individual "by virtue of his HIV status [is] a person with a disability" under the ADA); *Severino v. North Fort Myers Fire Control Dist.,* 935 F.2d 1179, 1182 n. 4 (11th Cir.1991) (holding that the contagiousness of AIDS makes it a handicap); *Baxter v. City of Belleville,* 720 F.Supp. 720, 730 (S.D.Ill.1989) (HIV is handicap under Fair Housing Act).

*Nassau County School Board v. Arline,* 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (U.S. 1987) (persons with contagious disease may be handicapped under Rehabilitation Act) (Following the *Arline* decision, the Justice Department issued a memorandum concluding that the Rehabilitation Act protects HIV infected individuals through the full spectrum of asymptomatic infection to AIDS. Daily Lab.Rep. (BNA) (Oct. 7,

determined by the courts to be *per se* disabilities. In other words, it has been established both that these conditions impact a major life activity and that this impact is substantially impairing of a given activity. Other conditions that are not on these lists must be resolved on a case-by-case basis.

In summary, some conditions have been established through regulations and case law to be *per se* disabilities. If a condition has not been established to be a *per se* disability, an individual attempting to classify a condition is not lost in the wilderness. Rather, regulations and case law have consistently maintained that the concepts of "disability" and "major life activities" are to use precedent established under the Rehabilitation Act as a guide.

■ If neither the EEOC regulations nor the case law has found a condition to be a *per se* disability, then the court is left to the three-part test for disability found in § 12102(2). Each of these three heads of ADA coverage raise questions of application. The following is a chart of permutations regarding subjective and objective aspects of the three-part test, and when this Court believes coverage of the act is to be afforded:

## BASIC PERMUTATIONS OF ADA COVERAGE: [26]

### THE THREE TESTS UNDER § 12102(2)

| Case Specific Facts | Coverage |
| --- | --- |

**1. PRESENT DISABILITY:**

| | |
| --- | --- |
| Employee has disability in fact | ********* |
| Employer knows about the condition | * yes * |
| Employer believes condition SIMLF | ********* |
| | |
| Employee has disability in fact | ********* |
| Employer had no knowledge of condition | * yes * |
| | ********* |
| | |
| Employee has disability in fact | ********* |
| Employer is aware of the condition | * yes * |
| Employer does not think condition SIMLF | ********* |
| | |
| Employee has no disability in fact | ********* |
| | * no * |
| | ********* |

In summary, when an employee has a present disability and the employer treats the employee adversely because of that condition, the ADA is violated.

| Case Specific Facts | Coverage |
| --- | --- |

**2. RECORD:**

| | |
| --- | --- |
| Employee has record of a condition | ********* |
| Condition SIMLF | * yes * |
| Employer knows of the record | ********* |
| Employer believes condition SIMLF [27] | |
| | |
| Employee has record of a condition | ********* |
| Condition SIMLF | * yes * |
| Employer knows of the record | ********* |
| Employer does not believe condition SIMLF | |
| | |
| Employee has record of a condition | ********* |
| Condition SIMLF | * no * |
| Employer does not know of the record | ********* |
| | |
| Employee has record of a condition | ********* |
| Condition does not SIMLF | * yes * |
| Employer knows of the record | ********* |
| Employer believes the condition SIMLF | |
| | |
| Employee has record of a condition | ********* |
| Condition does not SIMLF | * no * |
| Employer knows of the record | ********* |
| Employer does not believe condition SIMLF | |
| | |
| Employee has no record of a condition | ********* |
| Employer believes Ee has a record | * yes * |
| Employer believes condition SIMLF | ********* |
| | |
| Employee has no record of a condition | ********* |
| Employer believes Ee has a record | * no * |
| Employer does not believe cond. SIMLF | ********* |

■ In summary, when an employer knows an employee has a record of past disability or when an employer thinks an employee has a record of past disability, and the employer treats the employee adversely because of this record, the ADA is violated.

1988)); Washington–Carter, Pamela, *AIDS & Disability–Based Discrimination in Employer–Provided Health Insurance*, 20 S.U.L.Rev. 457 (1993).

**26.** Assume that in all these situations the action was taken by either an employer or a third-party contractor in some way because the individual was disabled, perceived to be, or had a record of such.

**27.** The acronym "SIMLF" stands for "substantially impairs a major life function."

| Case Specific Facts | Coverage |
|---|---|
| **3. REGARDS AS DISABLED:** | |
| Employee has no disability in fact | ********* |
| Employer believes Ee has a condition | * yes * |
| Employer believes condition SIMLF | ********* |
| | |
| Employee has no disability in fact | ********* |
| Employer believes Ee has a condition | * yes * |
| Employer believes the condition SIMLF | ********* |
| Condition does not SIMLF in fact | |
| | |
| Employee has no disability in fact | ********* |
| Employer believes Ee has a condition | * yes * |
| Condition is a disability per se | ********* |
| Employer does not believe condition SIMLF | |

In summary, when an employer believes an employee has a condition that substantially impairs a major life function or believes an employee has a condition that has been classified as a *per se* disability, and the employer treats the employee adversely because of this belief, the ADA is violated.

Beyond this formulaic understanding of the ADA, the question remains: Who determines these facts? [28]

### D. Who Determines When a Disability Exists?

It has not been clearly established who is to determine at the trial level whether or not a plaintiff has standing to sue pursuant to the Act (i.e. who is to determine whether a given individual in specific circumstances is meant to be protected by the Act).[29] The standard of "substantial impairment of a major life activity" is clear, but who is to apply the standard is not. Is this a fact question for the jury or a legal question for the court? Is the question of whether the plaintiff is covered by the ADA a threshold standing issue for the court or an element of the cause of action to be determined by the jury?

This court holds that when a condition has not been found to be a *per se* disability, the courts are to treat the question of whether a given condition is a disability as a mixed question of law and fact. Although one could imagine a regime wherein a jury would conclusively decide the issue of disability, the question of whether a plaintiff is in a protected class seems at times appropriately in the judgment of the court.[30] Thus, sometimes it will be clear (as when no reasonable jury could find otherwise) that a given condition is a disability. At those times, a judge should not let that question go the jury; rather the judge should instruct the jury the plaintiff need not prove this issue in the case,[31] but should submit to the jury the question of whether the plaintiff was discriminated against due to his condition.

In cases where a plaintiff is asserting that an employer *regarded* a rather run-of-the-mill condition to be a disability, a court may well require a jury determination on the question of actual perception by a key actor in the employment context.[32] Furthermore, some courts have found that the "record of disability" provision requires that the plaintiff prove to the trier of fact that the employer had knowledge of the record.[33]

**28.** *Viz.*, the facts of whether there is major life activity and whether there is a substantial impairment of that activity.

**29.** The class of individuals protected by the ADA is defined as those with a present disability, those who have a record of such a disability, and those with a condition perceived as a disability.

**30.** Determinations of whether a plaintiff falls within a protected class (e.g. is a woman or is a minority), although factually grounded, seem in practice to turn into questions of law (i.e. only one factual determination is reasonable as a matter of law). It is the responsibility of the judge to instruct the jury whether a given plaintiff (e.g. an African–American) falls within a protected class.

**31.** For a related treatment of mixed questions of law and fact, see the Supreme Court's analysis of who is a "member of the crew" (i.e. seaman) in maritime law. Because statutory terms are at issue (as is the case with "disability" and the ADA), it is the court's duty to define the appropriate standard. However, if reasonable persons applying the proper legal standard could not differ as to whether an employee is a member of a crew (or that an individual is disabled under the ADA), then it is not a question for the jury. *See, e.g., Chandris, Inc. v. Latsis,* —— U.S. ——, ——, 115 S.Ct. 2172, 2190, 132 L.Ed.2d 314 (U.S.1995).

**32.** *See Cook v. State of Rhode Island, Department of Mental Health, Retardation, and Hospitals,* 10 F.3d 17 (1st Cir.1993).

**33.** *See Grinstead v. Pool Company of Texas,* 1994 WL 25515, *2 (E.D.La.1994) ("obviously a defendant cannot discriminate against a plaintiff because of his record of disability when it had no knowledge of that record"), *aff'd.* 26 F.3d 1118 (5th Cir.1994); *Fehr v. McLean Packaging Corp.,*

This appears to be a fair interpretation of the statute.[34] On the other hand, many conditions will be disabling or non-disabling on the basis of general facts and perceptions (i.e. it is generally not a complete defense for an employer to prove that he did not perceive a condition to be a disability in any given case).[35]

## 7. MR. ANDERSON HAD A DISABILITY.

If HIV[36] is not a *per se* disability (as the court believes it is),[37] then the court finds that Anderson's HIV-status *in this case* was a disability as a matter of law. Without question, AIDS[38] is a *per se* disability, and Anderson had AIDS.

The court further notes that testicular cancer in this case, where Anderson was subject to surgery and irradiation of the testicles is probably a disability or is regarded as such.[39] Cancer in many contexts has been found to be a disability.[40] Indeed, cured cancer has been used as a frequent example of situations the ADA covers by its "is regarded as disabled" language.[41] Nonetheless, this court, in an abundance of caution, does not hold at this time that Anderson's testicular cancer was a condition covered by section 12102(2).

860 F.Supp. 198, 200 n. 4 (E.D.Penn.1994) (finding the issue of coverage under § 12102(2)(B) to involve "the inherently factual question of whether the employer had particular knowledge"); *Lowe v. Angelo's Italian Foods, Inc.*, 1994 WL 675027, *5 (D.Kan.1994) (stating that when a plaintiff has presented no evidence that defendants were aware of plaintiff's impairment, the plaintiff could not rely on the "having a record of" or "being regarded" as having a disability prongs of section 12102(2)).

34. In most circumstances, however, this Court holds that constructive and not actual knowledge is sufficient. In other words, the plaintiff meets the burden of proving knowledge by showing that the employer had in its possession the record in question. To hold otherwise would put too great a burden on the plaintiff and would make evasion of the ADA's purposes too convenient.

35. For example, if it was established at trial that the employer believed the employee had AIDS but could also prove that the employer did not perceive AIDS to substantially limit a major life activity, the employee would still be disabled under the ADA's second prong ("having a record of"). Furthermore, "regarded" has two meanings under the third prong of the disability definition. If a condition given the circumstances of the case is not as a matter of law a disability or so regarded, then the trier of fact is to determine whether the employer regarded it as such. On the other hand, if a condition in given circumstances is a disability or so regarded, then subjective ignorance is no defense.

36. Both HIV-positive status and AIDS are defined as disabilities under the Department of Justice regulations promulgated pursuant to the ADA. 28 C.F.R. § 36.104(1)(iii); *Howe v. Hull*, 873 F.Supp. 72 (N.D.Ohio 1994).

37. Beyond the obvious impairment on the ability to procreate, even an asymptomatic HIV-positive individual can not travel freely. Such an individual must be always mindful of exposure to bacterial infection and fungi or even places requiring vaccinations.

38. The legislative history of section 3(2) of the ADA discusses AIDS and HIV infection as disabilities covered by the ADA. H.R.REP. No. 101–485(II), 1990 U.S.C.C.A.N. 303, 334; 136 Cong. Rec. H2442 (May 17, 1990).

39. Although the Court understands that the "perceived as a disability" prong of the disability test has at times been thought to be a fact question for the jury, here the record may be developed well-enough for the Court to declare as a matter of law that the testicular cancer was both a disability and was perceived to be such. *Cf. Cook v. State of Rhode Island*, 10 F.3d 17 (1st Cir.1993) (where the question of whether an employer believed morbid obesity was a disability was one for the jury).

40. *E.g. Moore v. Sun Bank of North Florida*, 923 F.2d 1423 (11th Cir.1991) (assuming that brain tumor was a handicap under the Rehabilitation Act); *Katradis v. Dav–El of Washington, D.C.*, 846 F.2d 1482, 1484 (D.C.Cir.1988) (noting that the District of Columbia Human Rights Act, wherein handicap has historically been interpreted precisely as the Rehabilitation Act's use of the word, now explicitly states that cancer "substantially limits major life activities"); C932 ALI–ABA 343 (July 21, 1994) (using example of where chemotherapy for cancer would be a required accommodation because cancer was a covered disability).

41. *See, e.g.*, Bonnie P. Tucker, *The Americans With Disabilities Act of 1990: An Overview*, 22 N.M.L.REV. 13, Part II (1992); Lisa A. Montana-

## E. What is Discrimination in the Provision of Health Insurance?

8. THE EVENTS OF THIS CASE CONSTITUTED DISCRIMINATION.

■ In the analysis that follows, this Court is drawing all reasonable inferences in the light most favorable to the defendant. So, for example, it will be assumed that Anderson's testicular cancer was not a disability. This court, however, is required by case law and common sense to consider Anderson's HIV[42] and AIDS conditions to be *per se* disabilities.

Anderson was an otherwise qualified individual with a disability (AIDS). Gus Mayer sought alternative health insurance to secure reductions in cost. Gus Mayer knew that one main reason for increased costs was that Anderson had HIV. Therefore, as opposed to a one-time premium increase, Gus Mayer knew that the premiums were not going to be lowered to previous levels.

■ In the area of health insurance, two basic mandates underlie the entire ADA philosophical approach according to agency interpretations: First, employees with disabilities must be accorded equal access[43] to whatever health insurance the employer provides to employees without disabilities; second, in employment decisions, employers may not take as a factor concerns about the impact of an individual's disability on the employer's health insurance plan.[44] Gus Mayer with full knowledge of the probable exclusion of Anderson because of his AIDS-status still chose to apply to JALIC only.

Anderson was not afforded equal access to JALIC coverage because of his disabilities, HIV and AIDS. JALIC categorically excluded individuals with AIDS from their plans, and it had no formal policy regarding HIV-positive individuals.

■ The fact that JALIC claims it had an independent reason (cancer) for declining Anderson is of no consequence, because equal access means *at a minimum* that an individual with a disability must have an *opportunity* to participate in a group plan. To recap:

1. Gus Mayer wanted to reduce premiums so it approached JALIC.

2. JALIC would not allow anyone into its group plan who had AIDS or who had been treated for cancer in the past ten years.

3. JALIC would not cover David Anderson putatively because he had been treated for cancer.

4. After becoming aware of these facts, Gus Mayer had the opportunity, at no cost, to opt-out of coverage by JALIC.

■ This court finds that when an employer changes group health providers to an insurer that would never consider covering one of the employees in the group because of that employee's disability (in this case, AIDS), the employer violates the ADA (because it has not provided equal access to insurance).[45] The whole notion of equal access demands the employment of an *ex ante* perspective.[46] Before applying to JALIC

ro, *The Americans With Disabilities Act: Will the Court Get the Hint?*, 15 PACE L.REV. 621 (1995).

**42.** Whether or not Anderson's HIV-status is a disability of any kind under the ADA is not essential to the Court's holding today. It is enough to observe that Anderson had AIDS and AIDS is a *per se* disability. Thus, Anderson was an individual with a disability.

**43.** Americans With Disabilities Act of 1990, H.R.REP. 101–485(III), 101st Cong., 2nd Sess. 1990, 1990 U.S.C.C.A.N. 445.

**44.** Frank Morris and Teresa Jakubowski, *The Americans With Disabilities Act and Other Health Issues in the Workplace*, C932 ALI–ABA 343, 369–70 (July 21, 1994); Susan Nanovic Flannery, *Employer Health–Care Plans: The Feasibili-*

*ty of Disability–Based Distinctions Under ERISA and the Americans With Disabilities Act*, 12 Hofstra Lab.L.J. 211, 231–32 (Spring 1995).

**45.** It may be the case that if an individual with a disability is employed at a place of business where individuals have access to group plans, then that individual must be given access to comparable coverage of some sort.

**46.** To make sense, the ADA must protect individuals with disabilities from going through the motions (i.e. a bunch of unnecessary procedures when the outcome is predetermined) and then being denied coverage. If the employee never had a real opportunity of inclusion in a group plan because of his disability, then it does not matter what the putative basis of the employee's rejection is—a violation of the ADA has occurred.

(*viz., ex ante* ), Anderson had a zero percent chance at coverage **because** of his disability. In addition, Gus Mayer did not secure some alternative form of insurance for that employee with a disability.[47]

### F. Are There Any Defenses to the Denial of Equal Access?

9. SECTION 501(c) IS NOT APPLICABLE TO TOTAL DENIAL CASES.

■■■■■ Section 501(c) of the ADA explicitly allows some disability-based distinctions within insurance policies to be drawn by insurers. However, total denial of group health coverage to an individual does not implicate risks. In other words, disability-based distinctions are only relevant when some coverage is extended to an individual with disabilities.[48] No actuarial risk makes someone uninsurable. How does the fact that someone has AIDS affect one's chances of getting a broken leg? Even if positive correlations could be shown, JALIC has made no claim that it has conducted any such studies. The ADA puts the burden on those actors classifying risks to show both their rationality and permissibility.

The EEOC Interim Guidance establishes a two step process when looking at alleged insurance discrimination: 1. Determine whether the challenged insurance term is a **Disability-Based Distinction;** [49] 2. If and only if there is disability-based distinction, then determine whether **section 501(c)** [50] of the ADA protects that disability-based distinction.

■■■■ Here, Anderson was not subject to any disability-based distinctions in coverage. Instead, Anderson was denied **ANY and ALL** coverage whatsoever. It was not that coverage was being distributed unevenly; rather, Anderson had no coverage to be ratcheted down. He did not suffer from reduced coverage or caps on reimbursement; rather, because he had AIDS, Anderson was completely denied access to the group health insurance. The ADA requires that employees with disabilities must be afforded equal access to whatever health insurance coverage the employer provides. In the area of group health insurance, the legislative history is clear:

> [W]ith respect to group health insurance coverage, an individual with a pre-existing condition may be denied coverage for that condition for the period specified in the policy but cannot be denied coverage for illnesses or injuries unrelated to the pre-

47. In point of fact, there may be far more direct routes for finding Gus Mayer violated the ADA. However, this Court is comfortable with saying that at a minimum, if no defense is proffered, Gus Mayer committed a violation of the ADA in this way.

As a side note, the plaintiffs are correct to point out that Gus Mayer would have clearly violated the ADA if JALIC had denied Anderson due to his HIV-status. Indeed, the EEOC found that the real reason Anderson was not covered by JALIC was because of his HIV condition. Likewise, if cancer is covered under the ADA (as this Court believes is the case in these circumstances), Gus Mayer violated the ADA when JALIC completely denied Anderson coverage because of his record of cancer.

48. Even if an insurance practice is deemed to be a disability-based distinction, a covered entity must prove that the practice is not a subterfuge to evade the broad salutary purposes of the ADA. The EEOC has taken the position that one justification for a disability-based distinction is if the "challenged term or provision is necessary to prevent an unacceptable change either in the

plan's coverage or its premiums, co-payments, or deductibles." Frank Morris and Teresa Jakubowski, *The Americans With Disabilities Act and Other Health Issues in the Workplace,* C932 ALI–ABA 343, 368 (July 21, 1994). To be unacceptable, the change must be a drastic increase in costs or a drastic reduction in the plan's scope of coverage or level of benefits. "In addition, this unacceptable alteration must either render the plan effectively unavailable to a significant number of employees, or make the plan so unattractive that significant adverse selection results...." *Id.*

49. Disability-based distinction means a classification affecting a particular disability, a discrete group of disabilities (e.g. cancers) or disability in general (e.g. non-coverage of all conditions which substantially limit a major life activity).

50. Section 501(c) of the ADA, codified at 42 U.S.C. § 12201(c), is a provision that has been the source of a lot of confusion. It provides that the Title I and Title II are not to be construed to prohibit insurers from classifying risks in manners not used as subterfuge to evade the purposes of the ADA itself.

existing condition.[51]

■ For the reasons set forth above, section 501(c) does not apply to situations where an individual with a disability has been totally denied coverage of any kind.[52] The EEOC found that David Anderson was not provided any insurance coverage whatsoever, and as such section 501(c) did not immunize Gus Mayer's actions. When complete denial of coverage is at issue, there simply are no disability-based distinctions to be considered.[53] Section 501(c) does seem to state that it may be possible to provide certain coverage exclusions to individuals with disabilities if the risks of those disabilities so warrant and those risks are treated like other similar risks not associated with disabilities.[54] The burden is a very heavy one on the employer, and that burden cannot be borne by an employer who completely denies coverage to an individual due to a disability.[55]

■ In some situations, pre-existing conditions clauses, disability-based distinctions

supported by legitimate cost data, and other risk-classifying devices may be permitted, but complete denial is a *per se* violation of the ADA's mandate that employers provide individuals with disabilities equal access to group health insurance.

### 10. UNDUE HARDSHIP IS A FACT-SPECIFIC INQUIRY.

The ADA explicitly recognizes that integrating disabled individuals into the workforce often will result in increased costs. Increased costs are thought to be the price we as a people must pay for equal dignity. There comes a point, however, where enormous expense involved in providing equal terms of employment to an otherwise qualified individual may result in an **undue burden** for a covered entity. The ADA takes account of these rare situations where an accommodation may be financially crippling by the operation of section 12112(b)(5)(A).

---

**51.** H.Rep. No. 101–485(II), at 137; S.Rep. 101–116, at 85, U.S.C.C.A.N.1990, at 420; *see also Piquard v. City of East Peoria,* 887 F.Supp. 1106 (C.D.Ill.1995).

**52.** The Congressional debates are just as explicit as the final statutory language signed by President Bush. Senator Edward Kennedy stated from the floor of the Senate:

[U]nder the ADA, an employee with a disability must receive health insurance from the employer, if the employer is offering health insurance to other employees. As our committee report explained, employer may not deny health insurance coverage completely to an individual based on the person's diagnosis or disability.

136 Cong.Rec. S9683–03, 9697–9698 (July 13, 1990).

Similarly, Representative Edwards stated in the House:

[U]nder the ADA, an employee with a disability must receive health insurance from the employer, if the employer is offering health insurance to other employees. As our Judiciary report explained, employers may not deny health insurance coverage completely to an individual based on the person's diagnosis or disability.... It would also not be permissible to deny coverage to such individuals for other conditions not connected with these limitations on coverage, such as treatment for a broken leg or heart surgery.

136 Cong.Rec. H4624 (July 12, 1990).

**53.** Even if this case involved disability-based distinctions, which it certainly does not, the subterfuge exception to otherwise legitimate insurance

practices would in all likelihood mean that the defendant's conduct would still violate the ADA. The term subterfuge "simply[ ] denote[s] a means of evading the purposes of the ADA ... It does not mean that there must be some malicious intent to evade the ADA on the part of the insurance company or other organization...." 1994 Det.C.L.Rev. 1053

**54.** *See* Lawrence Lorber, J. Robert, Kirk, Suzanne Robinson, *Employer Health Insurance Plans and the ADA: New EEOC Guidelines Will Cause Collision,* 10 No. 8 HEALTHSPAN 3 (September 1993).

**55.** [E]mployers may not deny health insurance coverage completely to an individual based on the person's diagnosis or disability. For example it is permissible for an employer to offer insurance policies that limit coverage for certain procedures or treatments.... It would not be permissible, however, to deny coverage to individuals, such as persons with kidney disease or hemophilia, who are affected by these limits on coverage for procedures or treatments, for other procedures or treatments connected with their disability. It would also not be permissible to deny coverage to such individuals for other conditions not connected with these limitations on coverage, such as treatment for ... heart surgery. Americans With Disabilities Act of 1990, H.R.Rep. 101–485(III), 101st Cong., 2nd Sess. 1990, 1990 U.S.C.C.A.N. 445.

Whether an effort would be unduly burdensome depends upon the financial and structural resources of the covered entity. 42 U.S.C. § 12111(10)(B). The legislative history of the ADA recommends that the disabled person be consulted about what a reasonable accommodation might be to avoid employers overstating costs.[56]

In the context of health insurance, the EEOC Interim Guidelines state that an employer must prove that coverage for a discrete group of disabilities would be so expensive as to cause the Employer's plan to become **financially insolvent.**[57] The employer must also show that there is **no alternative** which would avoid the insolvency. This Court believes the question of undue hardship in the provision of David Anderson with equal access to health insurance to be a question for the fact-finder. As such, it is the basis of denying the Plaintiffs' Motion for Partial Summary Judgment.

### CONCLUSION

Gus Mayer is a covered entity. It contracted with JALIC for the provision of fringe benefits. Gus Mayer knowingly chose to contract with an insurer that never considered covering Anderson both because he had AIDS and because he had a record of cancer. According to the EEOC interpretations as well as this Court's own analysis of the statute, the case at bar does not implicate disability-based distinction analysis. Because no disability-based distinctions were drawn, the insurance provisions of section 501(c) are inapposite.

Barring undue hardship, a concept approaching financial ruin, an employer can not take the inevitable increased costs of insuring otherwise qualified individuals with disabilities into account when making hiring decisions. If an employer is not permitted to make hiring decisions based on real, actuarial risks, there is no reason to think that an employer can subvert the purposes of the ADA by hiring an individual only to deny him all health coverage because of his disability.[58]

An employer must provide equal access to insurance. It simply is too easy to subvert the purposes of the Act by selecting an insurer which has highly questionable refusal standards. One can understand the concept that the section 501(c) disability-distinctions raise a rebuttable presumption which can be overcome by proof that these risk-classifying decisions are factually and actuarially correct. However, to deny group health insurance of any kind to an individual with a disability because of his disability with no alternative insurance in place is an unacceptable affront to this historic new legislation.

To change insurance carriers and thereby knowingly exclude an individual because of his disability with the purpose of reducing premiums is a discriminatory act. In this context, the actual failure of Gus Mayer to provide insurance violates the ADA. If Gus Mayer is unable to defend these decisions by the proving undue hardship, then the plaintiffs will prevail pursuant to the Americans With Disabilities Act.

The court holds that upon the summary judgment proof in the record at this time, only two issues of fact remain: Whether Gus Mayer has appropriately availed itself of the ADA's undue hardship defense and what recoverable damages were sustained by Anderson due to the possible ADA violations by the defendant.

**56.** Monica E. McFadden, *Insurance Benefits under the ADA: Discrimination or Business as Usual,* 28 Tort & Ins.L.J. 480, 486.

**57.** *See* Lorber, supra note 54.

**58.** Whether this discrimination is direct (simply refusing to pay a premium for an individual with a disability when the employer pays premiums for other individuals) or indirect (allowing an insurer to refuse to consider covering an individual with a disability) is of no import.