**Richard McALINDIN, Plaintiff–Appellant,**

v.

**COUNTY OF SAN DIEGO; Rudolph Tamayo; Edward Baker; Gabriel Rodriguez; Does, one through 50, inclusive, Defendants–Appellees.**

No. 97–56787.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 10, 1999.

Decided Sept. 16, 1999.

Dennis M. Grady, Grady & Associates, San Diego, California, for the plaintiff-appellant.

Lloyd M. Harmon and William H. Songer, Office of the County Counsel, San Diego, California, for the defendants-appellees.

Before: D.W. NELSON, REINHARDT, and TROTT, Circuit Judges.

Opinion by Judge D.W. NELSON; Partial Concurrence and Partial Dissent by Judge TROTT.

D.W. NELSON, Circuit Judge:

### OVERVIEW

Richard McAlindin, who has been diagnosed as suffering from anxiety disorders, panic disorders, and somatoform disor-ders,[1] appeals the district court's grant of summary judgment on his Americans with Disabilities Act ("ADA") claim. McAlindin also appeals the district court's grant of summary judgment on his claim that the County of San Diego ("the County") retaliated against him for asserting his rights under the ADA. We hold that sleeping, engaging in sexual relations, and interacting with others are "major life activities" under the ADA, and that McAlindin has raised a triable issue as to whether he is substantially limited in a major life activity. We reverse the grant of summary judgment on the ADA claim and remand for further proceedings. However, we affirm the district court's grant of summary judgment on the retaliation claim.

### FACTUAL AND PROCEDURAL BACKGROUND [2]

McAlindin began working for the County's Housing and Community Development Department as a systems analyst in September 1983. Several doctors have concluded that McAlindin suffers from anxiety disorders, panic disorders, and somatoform disorders. He has received treatment, including psychotherapy and a number of medications, such as Xanax, Buspar, and Paxil. McAlindin explained his condition in his declaration, which stated the following:

> I have been diagnosed with anxiety disorders, including panic disorders and somatoform disorders.... Despite the medications [I take], I continue to experience symptoms so severe that at least once a month, I am completely incapacitated, and forced to lie down. Symptoms include dizziness, lightheadedness, narrowed vision, and strange sensations in my head, and my arms and legs. As a result of the medications, I experience

---

1. A somatoform disorder is a "condition marked by the presence of symptoms suggesting a physical disease but without physical changes or physiological mechanisms that might account for the symptoms. In addition, there must be evidence, or a strong suggestion, that the symptoms have a psycho-genic or psychologic origin." J.E. Schmidt, 5 *Attorney's Dictionary of Medicine and Word Finder* at S–206 (1999).

2. We recite the facts in the light most favorable to McAlindin, the non-moving party.

impotence. In addition, since 1989, I have frequently been unable to sleep and have had severe insomnia. The medication has helped with this, but I still experience problems with sleeping. Without the medication, my symptoms return. If I do not take my medication, I am unable to function. The frequency and severity of the symptoms increases to the point where I cannot take care of myself. My condition interferes with my ability to see and hear and speak. The sense of anxiety, without medication, is so overwhelming, that I am unable to do anything. I am essentially "paralyzed."

McAlindin received a "provisional promotion" in early 1989, which brought new, very stressful duties. In June 1989, McAlindin complained about a vendor's misconduct, yet his supervisors disregarded his complaints. According to McAlindin's supervisor, McAlindin became agitated and started shouting in an accusatory manner during the meeting. Soon thereafter, McAlindin sought and was granted leave due to "work stress." He obtained workers compensation for the stress.

In May 1992, McAlindin again took leave for stress-related disability. He submitted medical documents from his physician requesting that his leave be extended, and the County complied. When it became clear that McAlindin's leave would extend beyond a year, the County informed his attorney that his status would no longer be designated as "leave without pay with right to return." Pursuant to the County's regulations, individuals may not remain on disability leave "with right to return" for more than a year.

During McAlindin's leave, he repeatedly requested through his attorney a transfer to a different job as a "reasonable accommodation" required by the ADA. McAlindin explained that several of his doctors had advised that he not return to his previous work setting because the negative associations there would impede his recovery. The County responded by offering to place his name on the transfer list but made it clear that it would not make any special efforts to ensure a transfer. In addition, the County said that it preferred to explore ways of accommodating McAlindin in his present position. Based on his familiarity with the County, McAlindin states that "there are a number of positions for systems analysts [in other departments] and that vacancies occur with some frequency, because of transfers, and attrition." The County does not dispute this. The County maintains an unranked transfer list, which departments can utilize if they wish when they have vacancies. The County's policy is to require employees to arrange their own transfers.

In July 1993, the County required McAlindin to undergo an examination by a County-retained psychiatrist to evaluate his ability to return to work. Dr. Reiss confirmed the diagnosis of anxiety and panic disorders. Dr. Reiss also found that McAlindin required more aggressive medications and psychotherapy in order to return to his position. Dr. Reiss concluded that, with the proper treatment, McAlindin could return to his job in three to six weeks. After receiving Dr. Reiss' evaluation, the County told McAlindin that he had to obtain the required treatment and return to his job within two months, or else he would lose any likelihood of working for the County again.

When he returned from his second disability leave, McAlindin felt that the way he was treated by his supervisors changed drastically. McAlindin was given a written warning by his supervisor for sleeping at work, although he informed his supervisor that his doctor had prescribed medications that made him drowsy. McAlindin also complained about not receiving adequate training to help him adapt to the changing technologies in the department when he returned from his leave of a year and a half. McAlindin alleged that the other systems analyst in his department, Floyd Garrett, had been sent to off-site training, which McAlindin had been de-

nied. Garrett countered that he had not received off-site training and had been trained exclusively through an on-site computer tutorial and on-the-job-training. County officials testified that the County relies almost exclusively on the computer tutorial for training.

McAlindin sued the County and his supervisors for disability discrimination in violation of the ADA, 42 U.S.C. § 12101 *et seq.*, and the California Fair Employment and Housing Act ("FEHA"), Cal. Gov.Code § 12940 *et seq.*, and for age discrimination and retaliation under FEHA. On December 5, 1995, the district court granted in part and denied in part the County's motion for summary judgment. The court granted summary judgment on McAlindin's disability claim, holding that he lacked a "disability" within the meaning of the ADA. The court also dismissed McAlindin's state law claims for age and disability discrimination, from which McAlindin does not appeal. The district court expressed doubt that most of McAlindin's retaliation allegations could survive summary judgment. Nonetheless, because McAlindin asked to amend his complaint to add new factual allegations of retaliation regarding a recent suspension, the district court denied summary judgment on the retaliation claim.

On September 12, 1997, the district court granted summary judgment on most of the alleged instances of retaliation discussed in the 1995 order: (a) the denial of a transfer; (b) the revocation of McAlindin's "right to return;" (c) the County's requirement that McAlindin return to his former job; (d) the failure to provide necessary training; (e) the written warning for sleeping; and (f) general harassment/failure to accommodate.

Regarding McAlindin's remaining retaliation allegations, however, the district court denied summary judgment. The court found that there were factual disputes regarding a suspension and some negative evaluations that McAlindin received. Although McAlindin could have gone to trial on these issues, he chose to dismiss this part of his retaliation claim. On September 29, 1997, the district court entered final judgment, permitting McAlindin to appeal the grant of summary judgment on his disability and retaliation claims. McAlindin timely appealed. At the time of oral argument, McAlindin remained employed by the County. in his same job.

## STANDARD OF REVIEW

We review a grant of summary judgment de novo. *See Bradley v. Harcourt Brace and Co.*, 104 F.3d 267, 269 (9th Cir.1996) (citing *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir.1996)). "We must determine, viewing the evidence in the light most favorable to the non-moving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.*

## DISCUSSION

### I. DISABILITY.

#### A. Major life activities

■ The ADA, which prohibits discrimination against a "qualified individual with a disability," 42 U.S.C. § 12112(a), defines "disability" in part as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." *Id.* § 12102(2)(A).[3] In enacting the ADA, Congress chose to protect individuals who have mental impairments as well as those with physical impairments. *See Criado v. IBM Corp.*, 145 F.3d 437, 443 (1st Cir.1998); *Holihan v. Lucky Stores, Inc.*, 87 F.3d 362, 365 n. 3 (9th

---

3. The definition of disability also encompasses those who have a "record of such an impairment" or are "regarded as having such an impairment." 42 U.S.C. § 12102(2). Because we reverse the grant of summary judgment based on McAlindin's claim that he is actually disabled, we do not address whether he falls within these alternative definitions of disability.

Cir.1996); 29 C.F.R. § 1630.2(h)(2) (listing "emotional or mental illness" as an impairment). To be disabled under this definition, therefore, McAlindin must show an impairment that affects one or more major life activities. *See* 42 U.S.C. § 12112(a) (West Supp.1999).

Although the district court accepted McAlindin's claim that his anxiety disorder constituted an impairment, it determined that McAlindin was not substantially limited in any major life activities.[4] The district court summarily dismissed most of McAlindin's asserted major life activities and focused on the major life activity of working.[5] We thus analyze major life activities here in order to establish whether in addition to being impaired, McAlindin raises a genuine issue of material fact as to whether he is disabled for the purposes of the ADA.

■ According to the EEOC, major life activities include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* § 1630.2(i).[6] "[T]he first question is whether an individual is substantially limited in a major life activity other than working (e.g., sleeping, concentrating, caring for oneself)." Equal Employment Opportunity Commission, *EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities* 3 (March 25, 1997) [hereinafter *EEOC on Psychiatric Disabilities* ]. We conclude that the other activities-specifically, sleeping, engaging in sexual relations, and interacting with others-asserted by McAlindin are "major life activities" within the meaning of the ADA, and thus we need not address the district court's conclusion that he was not substantially limited in his ability to work. *See Taylor v. Phoenixville Sch. Dist.,* 174 F.3d 142, 152 (3d Cir.1999). Whether McAlindin faced substantial limitations in his ability to work is irrelevant to whether his limitations in other major life activities qualify him as disabled for ADA purposes.

■ The ADA does not define "major life activity." *See Bragdon v. Abbott,* 524 U.S. 624, 118 S.Ct. 2196, 2205, 141 L.Ed.2d 540 (1998). However, "the plain meaning of the word major denotes comparative importance and suggest[s] that the touchstone for determining an activity's inclusion under the statutory rubric is its significance." *Id.* (internal quotation marks omitted). The *Bragdon* Court noted that the term "major life activity" is very broad and includes activities that are private in character. *See id.* (rejecting attempt to confine major life activities to "those with a public, economic, or daily aspect"). A major life activity also must be "a basic activity that the average person in the general population can perform with little or no difficulty." *Pack v. Kmart Corp.,* 166 F.3d 1300, 1305 (10th Cir.1999). All of

---

4. The County has not disputed that McAlindin meets the other statutory requirements of (1) having an "impairment" and (2) being a "qualified individual," meaning he can perform the "essential functions" of his job. 42 U.S.C. § 12111(8).

5. We note that thirteen medical professionals examined McAlindin over a period of years, and all (even those retained by the government) concluded that McAlindin has a mental impairment. Four specifically recommended that McAlindin not return to his previous work setting because it would exacerbate his condition. Many discussed McAlindin's condition in some depth.

6. The Supreme Court recently called into question whether the EEOC has the authority to issue regulations implementing the ADA. *See Sutton v. United Air Lines, Inc.,* —— U.S. ——, 119 S.Ct. 2139, 2145–46, 144 L.Ed.2d 450 (1999). *But see id.* at 2161–62 (Breyer, J., dissenting) (arguing that the EEOC has this authority). The Court, however, ultimately declined to resolve this issue. *See id.* at 2145–46; *see also Murphy v. United Parcel Serv., Inc.,* —— U.S. ——, 119 S.Ct. 2133, 2138, 144 L.Ed.2d 484 (1999) (assuming that EEOC regulations are valid and applying them). Because the Supreme Court has not resolved this issue and the parties in the present case have not raised it, we continue to look to the EEOC regulations and interpretive commentary for guidance.

the major life activities that are relevant here—engaging in sexual relations, sleeping, and interacting with others—meet this requirement for the purposes of surviving disposition on summary judgment. The district court gave no reason why these activities are not significant in the life of the average person, like walking, speaking, and learning.

### 1. Sexual Relations

In *Bragdon*, which was decided after the district court granted summary judgment, the Supreme Court strongly implied that engaging in sexual relations, like reproduction, is a major life activity. *See* 118 S.Ct. at 2205 (holding that "[r]eproduction falls well within the phrase 'major life activity'" because "[r]eproduction and the sexual dynamics surrounding it are central to the life process itself"). Other courts have reached the same conclusion. *See, e.g., Anderson v. Gus Mayer Boston Store*, 924 F.Supp. 763, 775 n. 24 (E.D.Tex.1996) (AIDS impairs the major life activity of "engag[ing] in intimate sexual relationships"); *Doe v. District of Columbia*, 796 F.Supp. 559, 568 (D.D.C.1992) ("sexual contact" is a major life activity under the Rehabilitation Act, the ADA's precursor).

■ We conclude that engaging in sexual relations, just like procreation, is a major life activity. The number of people who engage in sexual relations is plainly larger than the number who choose to have children. Moreover, according to the reasoning employed by the Fifth Circuit with respect to working as a major life activity, sexuality is important in how "we define ourselves and how we are perceived by others" and is a fundamental part of how we bond in intimate relationships.

*EEOC v. R.J. Gallagher Co.*, 181 F.3d 645, 654 (5th Cir.1999).[7]

### 2. Sleeping

■ Common sense suggests that sleeping is also a major activity in the lives of most people. A person who gets the recommended eight hours of sleep a day spends one-third of each 24–hour day sleeping. Moreover, sleeping is indispensable to the maintenance of personal health. Therefore, we join the Second and Tenth Circuits in holding that sleeping is a major life activity. *See Pack*, 166 F.3d at 1305; *Colwell v. Suffolk County Police Dept.*, 158 F.3d 635, 643 (2d Cir.1998); *see also Criado*, 145 F.3d at 442 (suggesting that sleep is a major life activity).

### 3. Interacting with Others

■ The record indicates that McAlindin may be limited in a third major life activity, interacting with others. Because interacting with others is an essential, regular function, like walking and breathing, it easily falls within the definition of "major life activity." *See Criado*, 145 F.3d at 442 (plaintiff's mental impairment "substantially limited her ability to work, sleep, and relate to others"); *Sherback v. Wright Automotive Group*, 987 F.Supp. 433, 438 (W.D.Pa.1997); *EEOC on Psychiatric Disabilities* at 3. A court in another circuit, however, suggested that the "ability to get along with others" was too vague to be a major life activity, yet assumed that it was a major life activity for the purposes of its decision. *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 15 (1st Cir.1997).[8]

We see nothing in the statutory text that makes vagueness the test for determining what is a major life activity. We

---

7. In *Runnebaum v. NationsBank*, 123 F.3d 156, 170–71 (4th Cir.1997) (en banc), the Fourth Circuit expressed doubt over whether engaging in sexual relations is a major life activity, yet assumed that it was. The court provided no reasoning to support its skepticism. We think the Supreme Court's analysis in *Bragdon* resolved the doubt raised by the *Runnebaum* court.

8. The court acknowledged that "a more narrowly defined concept going to essential attributes of human communication could, in a particular setting, be understood to be a major life activity." *Soileau*, 105 F.3d at 15.

do not think that any vagueness in the term rises to the level of making it unworkable as a major life activity. In any event, interacting with others is no more vague than "caring for oneself," which has been widely recognized as a major life activity. *See, e.g., Bragdon,* 118 S.Ct. at 2205 (citing 45 C.F.R. § 84.3(j)(2)(ii)); *Cehrs v. Northeast Ohio Alzheimer's Research Ctr.,* 155 F.3d 775, 781 (6th Cir. 1998); *see also Dutcher v. Ingalls Shipbuilding,* 53 F.3d 723, 726 (5th Cir.1995) (defining caring for oneself as including everything from driving and grooming to feeding oneself and cleaning one's home).

■ Recognizing interacting with others as a major life activity of course does not mean that any cantankerous person will be deemed substantially limited in a major life activity. Mere trouble getting along with coworkers is not sufficient to show a substantial limitation. *See EEOC on Psychiatric Disabilities* at 5. Here, there are clinical findings indicating that one of the effects of McAlindin's mental illness is a pattern of withdrawal from public places and family members.

■ In addition, the limitation must be severe or, in other words, substantial when compared to the ability of "the average person in the general population." 29 C.F.R. § 1630.2(j)(1)(i); *see also id.* § 1630.2(j)(2)(i) (courts must consider the "severity" of the impairment). We hold that a plaintiff must show that his "relations with others were characterized on a regular basis by severe problems, for example, consistently high levels of hostility, social withdrawal, or failure to communicate when necessary." *EEOC on Psychiatric Disabilities* at 5.

*4. McAlindin's Evidence of Impairment*

■ The medical evidence in the record demonstrates a genuine issue of material fact as to whether McAlindin is substantially limited in these three activities. First, McAlindin stated in his declaration that he is impotent as a result of the medications he must take. There appears to be no other record evidence regarding his ability to engage in sexual relations. McAlindin's statement is sufficient to raise a genuine issue of material fact.

Second, McAlindin stated in his declaration that he had experienced great difficulty sleeping at night. In addition, as his doctor explained in a letter to his supervisor, McAlindin's numerous medications disrupted his normal sleep patterns and caused him to be drowsy at work. Although the record indicates that the sleep medication has helped McAlindin's ability to rest at night somewhat, his declaration states that his difficulty sleeping has persisted to some extent. This evidence raises a genuine issue of material fact regarding McAlindin's sleeping.

Third, several of the doctors who evaluated McAlindin documented his difficulty interacting with others. A review of the various medical evaluations indicates that, following his panic attack in 1992, McAlindin became increasingly withdrawn and his ability to deal with people and stress was seriously diminished. For instance, Dr. Sandweiss concluded that McAlindin "is *anxious all of the time* .... He has a fear reaction and feels that he has to constrict outside activities and stay away from crowds, shopping centers and any disagreement with his wife. He's around the house most of the time, at least 20 hours per day ...." (emphasis in original). Dr. Reiss likewise noted that McAlindin was barely functional, "avoid[ing] activities, for fear that they will make him feel more anxious" and stated that anxiety had a paralyzing effect on him. Consequently, "[McAlindin's] social activities are confined to his family. He is not involved in any groups or political or religious affiliations."

These evaluations suggest that McAlindin suffers from a total inability to communicate at times, in addition to a more subtle impairment in engaging in meaningful discussion. His alleged "fear reaction" and "communicative paralysis" are sufficiently severe to raise a genuine issue of

material fact about his ability to interact with others. Therefore, summary judgment would be inappropriate on this issue.

 Finally, we note that an intervening Supreme Court decision alters the standard by which we view McAlindin's claim. In *Sutton*, the Supreme Court held that "the determination of whether an individual is disabled should be made with reference to measures ... that mitigate the individual's impairment." 119 S.Ct. at 2143. The petitioners in *Sutton* claimed that they were disabled because of poor eyesight. With eyeglasses, their corrected vision was "20/20 or better." *Id.* (internal quotation marks omitted). As a result, the Supreme Court affirmed the dismissal of their complaint for failure to state an ADA claim. *See id.*

The Supreme Court recognized, however, that in some cases the use of medication may not eradicate the effects of illness, and a disability may remain either due to symptoms of the condition itself which persist despite the effects of medication, or as a result of the medication's side-effects. *See Sutton*, 119 S.Ct. at 2149. In his declaration, McAlindin stated that he was describing how his condition affected him "[d]espite the medications." The record reflects the existence of a genuine issue of material fact as to whether even with medication and other treatment, McAlindin's mental impairment substantially limits his major life activities discussed above.[9] Thus, while the ultimate disability determination in this case may be more complex than in cases not involving mitigating treatment, the facts alleged by McAlindin, if true, bring his case within the category described in *Sutton*.

### B. *Reasonable Accommodation*

 Having established a genuine issue of material fact with respect to the existence of a disability, we turn to the issue of reasonable accommodation. The ADA definition of discrimination includes "not making reasonable accommodations to the known physical and mental limitations of an otherwise qualified individual with a disability ... unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). McAlindin alleges that the County denied him a "reasonable accommodation" in violation of the ADA when it failed to transfer him to another job, failed to give him necessary training, and disciplined him for sleeping that was caused by his medications.

Although the district court did not address whether McAlindin's requested accommodations were "reasonable," the County urges us to affirm on the ground that McAlindin's requested accommodations were unreasonable. *See United States v. Lewis County*, 175 F.3d 671, 679 (9th Cir.1999) (citation omitted) (panel may affirm on any ground supported by the record). In its brief, the County repeatedly asserts that the fact that it treated McAlindin like all other employees means that it complied with the ADA.

However, the County misapprehends the ADA's requirement of reasonable accommodation. The issue is not whether McAlindin received the same treatment as everyone else did, but whether the employer took reasonable steps to accommodate his limitations in ways that would not impose undue hardship on the County. *See* 42 U.S.C. § 12112(b)(5)(A) (West Supp.1999). Here, the County does not present evidence that an undue hardship would result from transferring McAlindin, finding a way of accommodating his drowsiness due

---

9. McAlindin produced evidence that he continued to be impaired despite medication with respect to at least two of the three of the major life activities in which he claims to experience difficulty: sexual relations and sleeping. Given that the Supreme Court's clarification came after the district court's determination, McAlindin also should be given the opportunity to demonstrate at trial that his inability to interact with others continues to persist despite the medication.

to the medication, or providing him with additional training outside of the office environment. Given this omission, we cannot conclude that those activities would have imposed an undue burden on the County. Indeed, the evidence suggests the contrary.

 The essence of the concept of reasonable accommodation is that, in certain instances, employers must make special adjustments to their policies for individuals with disabilities. *See Shapiro v. Cadman Towers, Inc.,* 51 F.3d 328, 334–35 (2d Cir.1995) (rejecting argument that reasonable accommodation "requires only equal treatment"). The ADA places a "duty to accommodate" on employers in order to remove barriers that could impede the ability of qualified individuals with disabilities to perform their jobs. *Criado,* 145 F.3d at 445. Moreover, this is a "'continuing'" duty that is "'not exhausted by one effort'." *Id.* (quoting *Ralph v. Lucent Techs., Inc.,* 135 F.3d 166, 172 (1st Cir.1998)).

 In addition, we note that once McAlindin is viewed as disabled, the major life activities affected by the impairment are relevant only to the extent that they affect the type of accommodation that may be necessary and whether the employer has provided a reasonable accommodation. The existence of a genuine issue of material fact regarding disability and of one regarding reasonable accommodation require separate inquiries. In the reasonable accommodation analysis, we focus on the impairment as relevant to the workplace and thus on whether the employer is making reasonable accommodations. Thus, the sleep disorder and sexual dysfunction merely help to establish that the impairment (panic disorder after treatment) affects a major life activity; they are not relevant to the reasonable accommodation discussion, however, which focuses on the post-treatment panic disorder's manifestations in the workplace and the employer's response to them. *Cf. Bragdon v. Abbott,* 524 U.S. 624, 118 S.Ct. 2196, 2204–07, 141 L.Ed.2d 540 (1998) (discussing the ability to reproduce as the major life activity at issue with respect to HIV even though the discrimination involved refusal to provide medical care that was in no way connected to reproduction). The two inquiries become related only to the extent that the disability may impact the employer's ability to craft a reasonable accommodation for the employee.

The fact that the County generally requires employees to arrange their own transfers or disciplines all employees who sleep at work thus does not end the inquiry. Instead, the issue is whether a particular accommodation would be burdensome to the employer. According to the statutory language, the presumption is that the accommodation is required *"unless* [the employer] can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A) (emphasis added).

Consequently, we cannot affirm on the ground that McAlindin's requested accommodations are unreasonable because the County has presented no evidence indicating that arranging a transfer, for example, would impose an "undue hardship." The ADA specifically states that "'reasonable accommodation' may include ... job restructuring, part-time or modified work schedules, [and] reassignment to a vacant position." *Id.* § 12111(9)(B).

This conclusion is reinforced by evidence suggesting that McAlindin's request was not unduly burdensome. McAlindin asserts that "vacancies occur with some frequency, because of transfers, and attrition." The County has not disputed this claim. It has not alleged an absence of available vacant positions that McAlindin can perform. Nor has it explained where McAlindin is on the transfer list or why, years after he brought suit, McAlindin has not been offered a transfer. There is no evidence that deviating from its transfer policy would create an "undue hardship" for the County.

■ On the contrary, it appears that transferring McAlindin due to his anxiety disorder would not unduly disrupt other employees' expectations because the County's transfer list is *unranked* and transfers are distributed in an ad hoc manner at the discretion of the hiring department. *Cf. Shapiro*, 51 F.3d at 336 (noting that "[t]he extent to which a 'reasonable accommodation' for a handicapped individual can burden or take away rights or privileges enjoyed by the non-handicapped persons is an important question of first impression"). Finally, whether a particular accommodation is reasonable often "turns on the facts of the case." *Criado*, 145 F.3d at 443. This is certainly not a case in which the facts clearly demonstrate an undue burden, thereby making summary judgment appropriate. Given the lack of evidence offered by the County and the relatively unburdensome nature of the requested accommodation, we find that McAlindin raised a triable issue of fact. We thus reject the County's argument that we should affirm on this ground.[10]

## II. RETALIATION.

■ In order to establish a prima facie case on his FEHA retaliation claim, McAlindin must demonstrate that (1) "he engaged in a protected activity," (2) "his employer subjected him to adverse employment action," and (3) "there is a causal link between the protected activity and the employer's action." *Strother v. Southern Cal. Permanente Med. Group*, 79 F.3d 859, 868 (9th Cir.1996) (quoting *Flait v. N. American Watch Corp.*, 3 Cal.App.4th 467, 476, 4 Cal.Rptr.2d 522 (Ct.App.1992)). Next, the County is obligated to provide a

legitimate, nondiscriminatory reason for its actions. *See id.* McAlindin then must respond with "specific, substantial evidence of pretext." *Bradley*, 104 F.3d at 270 (internal quotation marks omitted). We affirm the district court's grant of summary judgment on the retaliation claim because McAlindin failed to establish a prima facie case.

The allegedly retaliatory conduct asserted by McAlindin and considered by the district court in its 1995 order[11] was the following: (1) his co-workers ignored him; the County (2) failed to provide necessary training when he returned from disability leave; (3) failed to transfer him to a different job; (4) failed to extend his employment status as "leave without pay with right to return;" and (5) reprimanded him for sleeping on the job.

■ It is undisputed that by vigorously asserting his rights under the ADA, as well as other state and federal discrimination laws, McAlindin engaged in protected activity and established the first element of a prima facie case. The County claims, however, that McAlindin has not established the second element. Relying on cases from other circuits holding that an employer's conduct must constitute a demotion or be similarly severe, the County contends that McAlindin has not suffered an "adverse employment action." The County is correct that McAlindin's sense of isolation is not actionable. *See Strother*, 79 F.3d at 869 ("Mere ostracism in the workplace is not enough to show an adverse employment decision." (citation omitted)).[12] In addition, the County's refusal to extend McAlindin's "right to re-

---

10. We also reject the County's contention that the EEOC commentary, 29 C.F.R. § 1630 (App.), precludes transferring McAlindin. Even if the County's erroneous construction of this commentary were correct, it would not control because it would conflict with the clear language of the statute, which permits job transfers. *See* 42 U.S.C. § 12111(9).

11. In his briefs, McAlindin alludes to additional incidents of retaliation. Because McAl-

indin chose to dismiss the part of his retaliation claim that was based on these incidents in order to create appellate jurisdiction, we do not consider these incidents.

12. We note that McAlindin has not presented evidence of any specific instances of harassment. He complains only of a very general sense of isolation in the workplace.

turn" beyond a year, which was dictated by its leave policy, was not an adverse employment action. Given that the County permitted McAlindin to return to his job and informally assured him all along that it would respect his rights under the ADA, we see no harm that constituted an adverse action.

■ The remaining incidents, however, do qualify as adverse employment actions. We have previously rejected the County's argument that adverse actions must be severe. "[A plaintiff] need not show that she was fired, demoted, or suffered some financial loss...." *Bouman v. Block*, 940 F.2d 1211, 1229 (9th Cir.1991). In *Bouman*, we held that if a transfer to a "position was not made available to [plaintiff] because of her involvement in protected activities," then she suffered an adverse employment decision. *Id.*

■ Nonetheless, McAlindin's retaliation claim ultimately fails because he has not established the third element of a prima facie retaliation claim: that the adverse actions occurred *because of* his protected activities. *See Strother*, 79 F.3d at 868. The undisputed evidence shows that all of the adverse actions occurred because the County followed universally-applied policies, and not because McAlindin was targeted for unfavorable treatment on account of his protected activities. We address each of McAlindin's retaliation claims below. McAlindin was not targeted for unfavorable treatment because· of his protected activities; to the contrary, he was treated like all other employees. Although the ADA imposes a different standard by virtue of the duty to make reasonable accommodations, *see supra*, under FEHA, McAlindin must show that he was targeted for adverse treatment.

■ McAlindin attempts to establish adverse treatment in four ways. First, McAlindin claims that the County denied him the opportunity to attend an off-site training seminar in the Natural computer language. The evidence indicates that the County expects its employees to learn Natural from a computer tutorial that they can use at work. The only other Systems Analyst learned Natural exclusively through the tutorial and on-the-job training. The County's expectation that McAlindin do the same is not evidence of retaliation. McAlindin's only response is that a County employee's statement that the County "has been able to rely *almost exclusively* on [the tutorial] and project assignments for our analysts to become proficient in Natural," indicates that some analysts have received additional training. But even if that is the case, there is no evidence that the additional training included funding off-site seminars or that any such opportunities were distributed in a discriminatory manner. The possibility that some analyst may have attended a seminar at some point in time does not entitle McAlindin to do the same.

■ Second, the County's failure to arrange a transfer is not evidence of retaliation. The evidence shows that the County's policy is to place the onus for arranging transfers on individual employees and the departments to which they wish to transfer. In response to a letter from McAlindin's lawyer requesting a transfer, the County offered to place McAlindin on the transfer list just like any other employee and said that it would send him a transfer form.

■ Finally, McAlindin has offered no evidence to show that the County targeted him for retaliatory treatment by citing him for sleeping. The County policy forbids sleeping at work, and McAlindin's snoring apparently disrupted the work of his co-workers. McAlindin does not contend, in the part of his FEHA claim that is on appeal, that he was disciplined because of a disability in violation of the portion of the Act that proscribes discrimination; rather, he asserts, without any evidentiary support, that he was disciplined in retaliation for his protests against the alleged discriminatory treatment. We affirm the dis-

trict court's grant of summary judgment on the retaliation claim.

## CONCLUSION

We therefore REVERSE the district court's grant of summary judgment on the ADA claim and AFFIRM the grant of summary judgment on the retaliation claim.

TROTT, Circuit Judge, concurring in part and dissenting in part:

Although I agree with the majority that McAlindin's retaliation claim fails as a matter of law, I respectfully disagree with the majority's conclusion that the rest of his case has any merit.

First, the majority claims for McAlindin a disability—"interacting with others"—that he does not claim for himself. Although the evidence strongly suggests that in fact he has a problem "interacting with others," McAlindin does not identify this plight as a mental or physical impairment that substantially limits one or more of his major life activities. Instead, McAlindin describes the disability upon which he grounds this lawsuit as a "generalized anxiety disorder or panic disorder," or an "anxiety/panic/somatoform disorder." At best, the suggestion that he cannot get along with others may be a *symptom* or a consequence of a disability, but not a disability per se.

Notwithstanding McAlindin's own description of his alleged disability, the majority inappropriately reaches out to plead for him a case he has not pleaded for himself. We have not had briefing or adequate argument on the tricky issue of whether "interacting with others" qua interacting with others could be a recognizable disability under this statute, yet we decide this non-issue anyway, warning everybody that simply being "cantankerous"—whatever the legal or scientific description of that is—won't be enough.

Ordinarily, we won't hear on appeal a past-posted claim not made in the district court, but here, we decide an explosive issue never discretely raised by McAlindin

anywhere. Moreover, not only do we serendipitously create a mischievous Pandora's box, but we then open it with a flourish and invite into federal court all but the "cantankerous" to sue those employers with whom they *cannot* get along. Employers beware, now you may have an obligation at the risk of being sued to accommodate someone who does not possess the ability to "get along with others." Not only is this "disability" vague, but it's bizarre, ominous, and wholly outside of the group of serious disabilities Congress intended to cover with this statute. Does this opinion suggest that a person's foul temperament may no longer be a reason to deny that person a job?

Second, the doctors evaluating McAlindin do not paint a picture of a man with a cognizable disability. Dr. Sandweiss, a treating physician, calls his impairment "slight to moderate," and this opinion was rendered *before* he began his medication. Dr. Rabiner says McAlindin is able to work. Dr. Reiss says that McAlindin is not disabled and requires no accommodation to return to work; and not one of the doctors claims that his condition is substantially limiting.

Third, I fail to see any causal connection whatsoever with McAlindin's alleged sexual disfunction and the job he wants, the job he has, or the adverse employment actions he alleges he suffered. Is the employer supposed to accommodate his impotence?

Fourth, McAlindin's proffered evidence fails utterly to show that he suffered an "adverse employment action." The defendants never denied him a transfer; they exercised their right to try keeping him in the same position first, remaining open to the idea that a transfer might be in order. Moreover, there do not appear to have been *any* consequences following the reprimand for sleeping when he was supposed to be working, a chastisement for which the employer can hardly be blamed. His request for accommodation seems to be a request that he be allowed to sleep when he is supposed to be working. Furthermore, the record reflects that McAlindin

got the same training everyone else did; and the record is significantly devoid of information that he needed special training *due to his disability.* I would affirm on the ground that McAlindin, failed to go beyond mere allegations, and to demonstrate that he suffered an "adverse employment action." In addition, the employer proffered irrefutably appropriate reasons for everything it did.

McAlindin describes himself, in what amounts to a self-serving diagnosis, as "essentially paralyzed." He says that the medication does not solve his work problems because "at least once a month, I am completely incapacitated and forced to lie down. The medication creates dizziness, lightheadedness, narrowed vision, and strange sensations in my head, and my arms and legs." If he is correct, I do not see how on earth such symptoms could be accommodated by his employer. McAlindin, who still works for the County, has never indicated how a transfer would help him perform the essential functions of the work he wishes to pursue, but more importantly, the employer did nothing to interfere with his right to transfer, telling him only that the request was "premature."