CALLAHAN, Circuit Judge,
dissenting:
A jury of Matthew Weaving’s peers sat in a courtroom for four days. They observed and listened to his coworkers, his supervisors, his doctors, his wife, as well as Weaving, himself. After being properly instructed on the law of our circuit, they dutifully studied the evidence and deliberated for eight hours over the course of two days. They found that Weaving was disabled and that the City of Hillsboro fired him because of his disability in violation of the Americans with Disabilities Act (“ADA”).
Now on appeal, the majority decides that it knows better. It reweighs the evidence on a cold record and issues its own diagnosis: Weaving isn’t disabled, he’s just a jerk. Therefore, the City was free to fire him. In the course of doing so, the majority usurps the jury’s role and guts our controlling circuit precedent, McAlindin v. County of San Diego, 192 F.3d 1226 (9th Cir.1999). Instead of following McAlindin, as it was bound to do, the majority abrogates McAlindin sub silentio and replaces our circuit’s standards with those announced in another circuit’s patently incompatible decision, Jacques v. DiMarzio, Inc., 386 F.3d 192 (2d Cir.2004). I cannot concur.
I
The majority selectively reviews the evidence to cast Weaving in an unsympathetic light.[1] But there are two sides to every *1115 story and the one that the jury heard was more nuanced than the majority acknowledges.
The evidence showed that Weaving was diagnosed with ADHD as a child but had been led to believe that he had “outgrown” his symptoms.[2] As an adult, Weaving had a strong dedication to police work, and initially “was a strong performer” as a patrol officer who was promoted to sergeant over several others. However, he had difficulty in his jobs both at the Beaverton Police Department and the Hillsboro Police Department (“HPD”), particularly once he was promoted beyond patrolman. In particular, his coworkers said that: they would avoid interactions with him; he would engage in lengthy lectures in response to simple questions; he would send impulsive emails; he would “beat a dead horse”; he was “socially retarded”; he made them feel intimidated and demeaned; he lacked any awareness of the reactions of others; and that he was hard to approach.
Lieutenant Richard Goerling’s investigation was critical to the City’s decision to terminate Weaving. Goerling found that Weaving had difficulty interacting with subordinates, peers, supervisors, and informants throughout his career. Among other things, Goerling concluded that Weaving refused to accept responsibility for his behavior. Goerling also repeatedly suggested that Weaving was a bully and intimidated his coworkers. At trial, however, Goerling admitted on the stand that he was biased against Weaving and that his report contained numerous inaccuracies and omissions in what were represented as interviewees’ direct quotations. Additionally, none of the City’s witnesses actually suggested that Weaving had bullied or intentionally intimidated his coworkers.
Deputy Chief Chris Skinner adopted Goerling’s characterization of Weaving as a “bully” and suggested that he was “hostile” in his letter advising Weaving of the City’s decision to terminate Weaving’s employment. Despite the fact that Weaving was found “fit for duty,”[3] Skinner concluded that Weaving was critically deficient in the area of emotional intelligence. At trial, Skinner testified that Weaving’s lack of emotional intelligence was the “foundation” of his decision. Skinner recognized that Weaving said that he had ADHD, but suggested that Weaving’s recent diagnosis was inconsistent with his earlier statements indicating that he had outgrown his symptoms and found that it did not substantially limit him in any major life activity, including work as a law enforcement officer. Skinner thus concluded that Weaving was not disabled and, in any event, that HPD could not accommodate him by returning him to duty as a sergeant.
At trial, Weaving explained that although he was aware that he had a history of childhood problems with ADHD, he initially did not believe that he was affected by it as an adult and also “didn’t want to be stigmatized as a police officer with a *1116 mental disorder.”[4] Weaving’s treating psychologist, Dr. Gary Monkarsh, testified that Weaving displayed “one of the clearest examples of adult ADHD I’ve ever encountered in my clinical practice in 25 years.” Dr. Monkarsh’s testimony suggested that much of Weaving’s problematic behavior was attributable to his ADHD, and that it could be successfully treated with medication and therapy. Among other things, Weaving had been able to improve his weak emotional intelligence — a common symptom of those suffering from ADHD — through therapy. Dr. Monkarsh elaborated that there is a “big difference” between someone who is simply “a jerk” and someone who has ADHD.
Driven by his love of his profession, Weaving had been able to become a successful police officer by developing compensatory mechanisms, such as calendaring systems, that allowed him to prioritize his tasks and overcome some of the effects of his disability, like slow processing speed. Nonetheless, Weaving was “unable to self-regulate” some of the other symptoms of ADHD without therapy, including impulsiveness, “not seeming to listen when spoken to, ... interrupting others, ... difficulty waiting his turn, blurting out comments without having emotional intelligence, [and lack of] awareness of the effect that that communication would have on his other workers at the police department.” ADHD thus impaired Weaving’s major life activities, including his “work.” Dr. Mon-karsh also indicated that although Weaving’s ability to articulate sounds was not impaired, his communication was impaired because of his lack of ability to speak with emotional intelligence.
Dr. Leslie Carter, an examining psychologist, agreed with Dr. Monkarsh’s diagnosis. Dr. Carter explained that Weaving had difficulty with his visual processing speed, an ADHD symptom. Dr. Carter elaborated:
[W]hat most people find is that they are inattentive to visual details, one thing that they have difficulty doing is paying attention to the facial expressions that people give. If they take — if a person takes more than 10 seconds to register facial expressions and respond to them, like processing speed, then they are thought to be out of sync or unempath-etic to other people, and they don’t feel right. And they — they make other people irritable, because they’re not quick enough with their responses, and they’re not recognizing the other person’s needs as quickly as they should.
Despite these diagnoses, based on a “file review” and without an actual examination, the City’s expert testified that Weaving did not have ADHD.
In his closing argument, Weaving’s counsel explained that he was substantially impaired in the major life activities of “interacting with others, working and communicating,” and continued:
Communicate, well, what does that mean? Well, it means a lot of what Dr. Monkarsh said, about what Chief Skinner said. Those are emotional intelligence things about communicating. It means not being impulsive, not being impulsive, where these things are coming up over and over again, pushing those e-mail buttons, giving those 30-minute lectures over and over and over again. That’s communicating.
The City argued that Weaving was not disabled.
*1117 The district court instructed the jury with the following variant of the model instruction:
Major life activities are the normal activities of living which a non-disabled person can do with little or no difficulty, such as caring for oneself, performing manual tasks, walking, sleeping, seeing, hearing, speaking, breathing, learning, engaging in sexual relations, reproducing, interacting with others, working, and communicating.
A limitation is substantial if the disabled person is unable to perform the major activity or is significantly restricted in doing so, when compared to the average person in the general population.
Factors to consider in deciding whether a major life activity is substantially limited include:
(1) the nature and severity of the impairment;
(2) the duration or expected duration of the impairment; and
(3) the permanent or long-term impact of the impairment.
The jury found that Weaving had proven that he had a disability under the ADA, that the City failed to reasonably accommodate his disability, and that the City discharged him because of it. Nonetheless, the jury found that Weaving had not proven that he was regarded as having a disability. The district court subsequently awarded equitable relief in the form of significant back and front pay in light of Weaving’s inability to find other employment and the court’s finding that Weaving would not be rehired in law enforcement.
II
We review the district court’s denial of a renewed motion for judgment as a matter of law de novo. Escriba v. Foster Poultry Farms, Inc., 743 F.3d 1236, 1242 (9th Cir.2014). Such a motion should be granted “if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury’s verdict.” Id. (citation omitted). In reviewing such a motion, we must scrutinize the entire evidentiary record and “draw all reasonable inferences in favor of the nonmoving party and ‘disregard all evidence favorable to the moving party that the jury is not required to believ.e.’ ” Id. at 1242-43 (citation omitted).
Ill
A
Weaving’s claims were predicated on impairments in his ability to communicate, interact with others, and work. He contended that his disability substantially impaired his ability to communicate and interact with others. His alternative (unsuccessful) theory was that HPD perceived him as having a communication disability that prevented him from working as a police officer.
The ADA prohibits employers from discriminating against qualified individuals on the basis of a disability. 42 U.S.C. § 12112. A “disability” is “a physical or mental impairment that substantially limits one or more major life activities of such individual.” 42 U.S.C. § 12102(1). An individual may establish coverage under the ADA based on an actual impairment, a record of having an impairment, or being regarded as having an impairment. Id.; 29 C.F.R. § 1630.2(g)(2). Major life activities “include, but are not limited to ... speaking ... communicating, and working.” [5] 42 U.S.C. § 12102(2)(A). The cur *1118 rent version of the regulations, effective May 24, 2011, further indicates that major life activities “include, but are not limited to ... communicating, interacting with others, and working.” 29 C.F.R. § 1630.2(i)(l)(i). Additionally, the ADA provides that: “The definition of disability ... shall be construed in favor of broad coverage of individuals.” 42 U.S.C. § 12102(4)(A). Thus, mental impairments are covered in addition to physical impairments. 29 C.F.R. § 1630.2(g)(1)(i). Such impairments consist of “[a]ny mental or psychological disorder, such as an intellectual disability (formerly termed ‘mental retardation’), organic brain syndrome, emotional or mental illness, and specific learning disabilities.” 29 C.F.R. § 1630.2(h)(2). ADHD qualifies as an “impairment” under the ADA. See Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499, 506 (7th Cir.1998).
' There was sufficient evidence to support the verdict based on Weaving’s ADHD substantially limiting his ability to interact with others. However characterized, the gist of Weaving’s primary claim all along has been that he suffered from the type of impairment that we recognized in McAlindin v. County of San Diego, 192 F.3d 1226, 1234-35 (9th Cir.1999). In McAlindin, the plaintiff contended that he suffered from anxiety and' panic disorders that would cause him to become “incapacitated” and force him to lie down “at least once a month.” Id. at 1230-31, 1241. Among other things, during one stress-induced incident that precipitated his taking leave from work, he became agitated, aecusato-ry, and shouted at a supervisor. Id. at 1231.
We reversed the district court’s grant of summary judgment on the plaintiffs ADA claim. Id. at 1230. We recognized that a plaintiff with an “interacting with others” impairment could prevail “[bjecause interacting with others is an essential, regular function, like walking and breathing.”[6] Id. at 1234. Thus, we held that a plaintiff could prevail where he showed “that his ‘relations with others were characterized on a regular basis by severe problems, for example, consistently high levels of hostility, social withdrawal, or failure to communicate when necessary.’ ” McAlindin, 192 F.3d at 1235 (citation omitted). Summary judgment was inappropriate on the plaintiffs claim because the evidence indicated that he “suffer[ed] from a total inability to communicate at times, in addition to a more subtle impairment in engaging in meaningful discussion.” Id. at 1235-36. We emphasized that the plaintiffs claims were supported by “clinical findings” and “medical evaluations.” Id. at 1235.
In so holding, we disagreed with the First Circuit, which had found that “the ‘ability to get along with others’ was too vague to be a major life activity.” Id. at 1234 (discussing Soileau v. Guilford of Me., Inc., 105 F.3d 12, 15 (1st Cir.1997)). We noted that interacting with others was no more vague than many other recognized major life activities, such as “caring for oneself.” Id. at 1234-35. Nonetheless, we also stated that merely being “cantankerous” or getting into “trouble” with coworkers was not sufficient to show a substantial limitation under the then-ap *1119 plicable ADA standards. Id. at 1235. The dissent criticized the “interacting with others” standard as “vague” and implying that “a person’s foul temperament may no longer be a reason to deny that person a job.” Id. at 1240.
In Head v. Glacier Northwest, Inc., 413 F.3d 1053, 1056-57, 1060-61 (9th Cir.2005), we reversed a grant of partial summary judgment on a similar ADA claim where the plaintiff suffered from the periodic inability to leave his house. He admitted that the behavior did not occur all the time, but asserted that it occurred “ ‘many times’ or ‘most’ of the time.” Id. at 1061. Although recognizing that the plaintiffs impairment did not appear to be as severe as the plaintiffs in McAlindin, we found that it was sufficient to avoid summary judgment. Id. at 1060-61.
In contrast, in Jacques v. DiMarzio, Inc., 386 F.3d 192, 200-04 (2d Cir.2004), the Second Circuit vacated a jury verdict based on an instruction that tracked the McAlindin standard. It held that in order to satisfy the standard for an “interacting with others” impairment, a plaintiff must establish that “the impairment severely limits the plaintiffs ability to connect with others, i.e., to initiate contact with other people and respond to them, or to go among other people — at the most basic level of these activities.” Id. at 203 (emphasis omitted). The court elaborated: “The standard is not satisfied by a plaintiff whose basic ability to communicate with others is not substantially limited but whose communication is inappropriate, ineffective, or unsuccessful.” Id. In announcing this standard, the Second Circuit disparaged McAlindin, stating:
While we accept the Ninth Circuit’s premise that “interacting with others” is a “major life activity” under the ADA, we conclude that the Ninth Circuit’s test for determining when a limitation on this activity is “substantial” for ADA purposes is unworkable, unbounded, and useless as guidance to employers, employees, judges, and juries. According to the Ninth Circuit — whose opinion in McAlindin the district court’s jury instructions in this case tracked — a plaintiffs impairment in “interacting with others” is “substantial” for purposes of the ADA when it is “characterized on a regular basis by severe problems, for example, consistently high levels of hostility, social withdrawal, or failure to communicate when necessary,” McAlindin, 192 F.3d at 1235, so that a mere “cantankerous[ness],” is not enough. Id.
The Ninth Circuit’s presumed demarcation — between persons who are “hostile” and those who are “cantankerous” — does not exist.... In a similar vein, the Ninth Circuit’s phrase, “consistently high levels of social withdrawal,” fails to capture the appropriate standard.
Id. at 202-03 (original ellipsis omitted). The court went on to suggest — as the dissent in McAlindin did — that the “Ninth Circuit approach” would frustrate “the maintenance of a civil workplace environment” by exposing employers to the risk of litigating hostile work environment claims by “unpleasant” employees.[7] Id. at 203.
*1120 The majority distinguishes McAlindin and Head by claiming that Weaving was “able to engage in normal social interactions” and that the plaintiffs in those cases “were essentially housebound.” Then, relying on the Jacques standard and channeling the McAlindin dissent, it holds that those who are capable of communicating but whose communications may be “inappropriate, ineffective, or unsuccessful” cannot prevail under the ADA because otherwise, employers would be exposed to liability in the form of actions by “ill-tempered employees who create a hostile workplace environment for their colleagues.”
We, however, are compelled to construe the evidence in favor of the jury’s verdict. See Escriba, 743 F.3d at 1242-43. Here, the evidence showed that Weaving was well beyond being merely cantankerous or troublesome. To the contrary, he had problems in his interactions with just about everyone throughout his career in law enforcement. Not only was he unable to engage in meaningful communication on a regular basis, but his ADHD made him seem unapproachable to his eoworkers, thus completely precluding some interactions. Moreover, the majority’s suggestion that Weaving’s “interpersonal problems” were limited to his interactions with peers and subordinates is dead wrong. HPD’s own investigation repeatedly suggested otherwise.[8] His doctors explained that his disability caused the severe lack of emotional intelligence that the City invoked when it fired him — he was not simply being “a jerk” who refused to control himself. The jury outright rejected the City’s opposing argument that Weaving was not disabled.
Weaving’s relations with others were undoubtedly characterized on a regular basis by severe problems including “high levels of hostility,” “failure to communicate when necessary” due to his perceived unap-proachability, and a constant inability to engage in “meaningful discussion.” See McAlindin, 192 F.3d at 1235. That is sufficient to satisfy McAlindin, which by its own terms, did not limit relief to the “housebound.” Consequently, under the law of our circuit, the jury was entitled to conclude that Weaving’s ADHD substantially limited his ability to interact with others.[9]
*1121 B
The City argues that even if Weaving can prevail under his “interacting with others” theory, the verdict should be vacated and remanded for a new trial because he could not prevail under his inability to “work” theory. Weaving’s ADA claim was based on alternative predicates supporting one legal claim. “When a general verdict may have rested on factual allegations unsupported by substantial evidence, we will uphold the verdict if the evidence is sufficient with respect to any of the allegations.” McCord v. Maguire, 873 F.2d 1271, 1273-74 (9th Cir.) (finding that a general verdict on a single claim of medical negligence had to be upheld where it was undisputed that four of the alleged acts of negligence were supported by the evidence and the defendant failed to request a special verdict form, despite the fact that four other acts were disputed), amended on other grounds, 885 F.2d 650 (9th Cir.1989). Accordingly, because Weaving satisfied the McAlindin standard, it does not matter whether he failed to establish that he had a work impairment.[10]
IV
Not all disabilities are obvious. To a casual observer, Matthew Weaving may not appear to be disabled. But that doesn’t give a panel of appellate judges license to brush away the contrary medical evidence and jury findings. Mental disabilities that cause socially unacceptable behavior are less obvious than physical disabilities, but the Americans with Disabilities Act protects those suffering from either form of disability equally.
The majority may not like Matthew Weaving — or at least the picture of him that it paints based on a cold record. But the outcomes of our disabled litigants’ cases should not turn solely on the amount of sympathy they, inspire. The law protects the disabled, not the likeable. Cf. Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 854, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (“[N]o judicial system could do society’s work if it eyed each issue afresh in every case that raised it. Indeed, the very concept of the rule of law underlying our own Constitution requires such continuity over time that a respect for precedent is, by definition, indispensable.” (citations omitted)). Because the majority has gutted our controlling precedent and substituted its own factual findings for that of the jury, I respectfully dissent.

. Significantly, the majority places undue emphasis on several incidents, such as the “water wings" email Weaving sent to a coworker. Weaving’s supervisor took no issue with the email when Weaving sent it, and the supervisor initially said that he thought the email was "funny.” Additionally, although Weaving occasionally used terms such as "meat eaters” and "salad eaters” to refer to his coworkers, those terms had been used in the local police culture for a long time and Weaving was not the only sergeant to use them. Similarly, Weaving's supervisor approved Weaving’s lengthy reprimand of a subordinate *1115 who drove a marked police car through a surveillance area, which later became the basis for the subordinate's grievance against Weaving. Moreover, although a sergeant recalled Weaving disparaging the work of an officer who spoke English as a second language, that sergeant agreed that the report that Weaving was referring to was of “poor” quality.

. In fact, although ADHD behavior can evolve over time, ADHD is thought to be a "lifetime condition.” See ADHD: ‘You don’t outgrow it,' Wash. Post, Dec. 17, 2013, at E5.

. The “fitness-for-duty” assessment came as a result of a psychiatrist and a psychologist concluding that Weaving's ADHD would not prevent him from returning to work as a police officer.

. Indeed, the City's human resources director suggested that Weaving might prefer to resign after he notified the City that he had ADHD because the information would “get out” to other potential law enforcement employers.

. This suggests that "speaking” and “communicating” are distinct major life activities.

. Accord Lemire v. Silva, 104 F.Supp.2d 80, 86-87 (D.Mass.2000) ("Human beings are fundamentally social beings. The ability to interact with others is an inherent part of what it means to be human. Even if we had the capacity to live without any human interaction, that capacity is immaterial in view of the highly interactive society in which we live. The ability to interact is thus both fundamental in itself and also essential to contemporary life. Beyond doubt, the ability to interact is at least as basic and as significant as the ability to learn or to work.”).

. Contrary to the Second Circuit’s criticisms, the McAlindin standard relies heavily on the existence of medical evidence to show a severe and regular impairment and does not simply give the ill-tempered free reign to cause havoc in the workplace. As one commentator explained:
The McAlindin standard, whereby those demonstrating severe problems on a regular basis, such as “consistently high levels of hostility, social withdrawal or failure to communicate when necessary,” strikes a good balance between frivolous and significant interacting with others claims.... Just *1120 as an individual in a wheelchair "may be mobile and capable of functioning in society but still be disabled because of a substantial limitation on their ability to walk or run,” an individual capable of interacting with others some of the time who nevertheless experiences significant difficulty in doing so likewise is substantially limited in the ability to interact with others. When applied diligently but not insurmountably to protect those who can demonstrate regular and severe difficulties communicating with others and interacting within appropriate social parameters, this standard should effectively negate the possibility of a floodgate of litigation.
Wendy F. Hensel, Interacting with Others: A Major Life Activity Under the Americans with Disabilities Act?, 2002 Wis. L.Rev. 1139, 1194 (citations and footnotes omitted).

. Goerling noted that supervisors regarded Weaving as "non-receptive to constructive criticism, self-satisfying, assuming,” that Weaving filed "formal complaints against his supervisors,” and Weaving seemed "to create ... interpersonal conflict everywhere he was assigned.” Skinner concluded that Weaving was unable "to work and communicate effectively with others in a team environment” given the "well documented impacts of [his] past interactions with subordinates, supervisors, and peers.”

. Even if I were to agree that the Jacques standard is preferable as a matter of policy, a three-judge panel cannot overrule McAlindin absent an intervening controlling authority to the contrary. See Miller v. Gammie, 335 F.3d 889, 899 (9th Cir.2003) (en banc). No such authority exists. Indeed, the only intervening authorities are the amendments to the ADA *1121 and regulations, which if anything, support a more expansive interpretation of the ADA. See ADA Amendments Act of 2008, Pub.L. No. 110-325, § 2(a)(4), 122 Stat. 3553 (2008) (amending the ADA to overrule Supreme Court decisions that had "narrowed the broad scope of protection intended to be afforded by the ADA.”); 29 C.F.R. § 1630.2(i)(l)(i) (including “communicating” and "interacting with others” among the list of major life activities).

. I would also hold that the district court did not err in giving the instruction providing that “[cjonduct resulting from a disability is part of the disability,” which was fully consistent with our decisions in Gambini v. Total Renal Care, Inc., 486 F.3d 1087, 1093 (9th Cir.2007), and Humphrey v. Memorial Hospitals Ass’n, 239 F.3d 1128, 1139-40 (9th Cir.2001).